In re Interest of Jody, Michael and Kelly Morrison, children.

Wayne Morrison et ux., appellants, v. State of Iowa, appellee.

No. 52224.

302

Lawrence E. LeTourneau and Harold L. Van Voorhis, Jr., both of Des Moines, for appellants.

Ray A. Fenton, Polk County Attorney, and Michael E. Hansen, Assistant County Attorney, for appellee.

LARSON, J.—The appellants, Wayne Morrison and Dorothy Morrison, natural father and mother of Jody Lynn, age 5, Michael Avery, age 4, and Kelly Wayne, age 23 months when these juvenile proceedings were commenced, for convenience will hereinafter be referred to as Mr. and Mrs. They were married October 20, 1959, in Des Moines, Iowa, after they had lived together for some time. Mrs. had been married to Eugene Norton, with whom she had five children. Norton secured an uncontested divorce from Mrs. after the birth of Jody, and he obtained custody of their children. Mr. had experienced some difficulties with the law and his kinfolks since boyhood and, although he and Mrs. got along well at first, his wanderlust or search for a better life resulted in many and long separations. Mrs. and the children lived part time in Des Moines, on a farm in Missouri with Mr.'s folks, and in Kansas. Finally in January 1965 she returned to Des Moines with the children and obtained work as a housekeeper and live-in babysitter. One of these jobs ended in a romantic attachment with an employer, Junior Allie, who was a widower with four children. Later, when Mr. came back to Des Moines and obtained work as a taxi driver, Mrs. and the children joined him. Domestic tranquillity did not result and, when it appeared Mrs. continued seeing Allie and was carrying his child, the situation worsened.

Emotional disturbances resulted in the hospitalization of both Mr. and Mrs. At Mr.'s request the Des Moines police took the three children to the Polk County Juvenile Home on June 23, 1965. The next day, pursuant to a preliminary investigation, an officer of the Juvenile Bureau filed a petition in the district court for an order declaring these children neglected under the provisions of chapter 232, Code 1962, codified and amended by

chapter 215, Acts of the Sixty-first General Assembly, effective July 4, 1965. Notice was given and hearing set for July 14, 1965. Temporary custody was given to the Juvenile Home. Hearing was postponed to July 28, 1965, to obtain certain medical, psychiatric and social history reports. At that time Mr. was in the State Hospital at Clarinda and did not appear. However, he was represented by counsel and, in the presence of Mrs. and her counsel, testimony was taken and the matter further continued. The court then released the children to the care and control of their maternal grandmother, Bonnie Hannon, who nevertheless permitted Mrs. to care for them in the Allie home. When released from the Clarinda Hospital on August 24, 1965, Mr. returned to Des Moines and consulted the juvenile authorities. Mrs. Hannon returned the children to the Juvenile Home on August 25, 1965, and declined further responsibility for them. On September 3, 1965, the second hearing was held, with both parents and their attorneys present. At its conclusion the court found the children neglected and ordered a petition be filed for "a different hearing, to terminate the parental rights of these people."

On September 28, 1965, this third hearing was held, with all parties and their counsel present. At the conclusion thereof the evidence and various reports were considered, and on October 27, 1965, the court filed its findings, concluding "both parents remain as persons of such unstable emotional status that for the children to continue to live with them would be highly detrimental to their well-being", that the parent-child relationship should be terminated, and that custody be retained by the court at the Polk County Juvenile Home pending further planning.

Both parents appeal to us. We affirm.

Appellants assign as error (1) the finding that the subject children were neglected, and (2) the order terminating the parental relationship. They also maintain chapter 232, as amended by chapter 215, Acts of the Sixty-first General Assembly, violates the Iowa Constitution, Article III, section 1, and denies due process of law as guaranteed by Article I, section 9, of the Iowa Constitution, and Amendment 14 to the United States Constitution.

I. It is appellants' contention that there is no evidence of any valid grounds enumerated in the statutes to justify the finding that their children were neglected or to support an order terminating their parent-child relationship. We have often considered similar contentions under the former provisions of chapter 232 of our Code. We have pointed out these laws were enacted more for the purpose of assisting unfortunate children than for punishing them. State v. Visser, 249 Iowa 763, 88 N.W.2d 925. It was to insure a child the care, custody and discipline that should be given by its parents. State ex rel. Bruner v. Sanders, 256 Iowa 999, 1007, 129 N.W.2d 602; State ex rel. Wiley v. Richards, 253 Iowa 679, 680, 113 N.W.2d 285, 286, and citations. We are satisfied the intent and purpose of the legislature was not altered by the amendment, revision and codification of statutes relating to dependent, neglected and delinquent children in chapter 215, Laws of the Sixty-first General Assembly, which repealed chapter 232 of the 1962 Code and enacted sections 2 through 62 in chapter 215 in lieu thereof. Spencer Pub. Co. v. City of Spencer, 250 Iowa 47, 92 N.W.2d 633. This law, now referred to as the "Juvenile Court Law", in section 2 provides that it "shall be liberally construed to the end that each child coming within the jurisdiction of the juvenile court shall receive, preferably in his home, the care, guidance, and control that will conduce to his welfare and the best interests of the state, * * *."

Section 3, paragraph 15, of chapter 215 provides: " 'Neglected child' means a child: a. Who is abandoned * * *. b. Who is without proper parental care *because of the emotional, mental, or physical disability, or state of immaturity of his parents,* * * *. c. Who is *without proper parental care because of the faults or habits of his parents* * * *. d. Who is living under conditions injurious to his mental or physical health or welfare." (Emphasis supplied.)

Section 41 provides: "No termination of the relationship between the parents and a child shall be ordered under the provisions of this Act except pursuant to the provisions set forth in sections forty-two (42) through fifty-one (51) of this Act. * * *."

Section 42 provides: "The court may upon petition termi-

nate the relationship between parent and child: 1. With the written consent * * *. 2. If the court finds that one (1) or more of the following conditions exist: a. That the parents have abandoned the child. b. That the parents have *substantially and continuously or repeatedly refused to give the child necessary parental care and protection.* c. That although financially able, the parents have substantially and continuously neglected to provide the child with necessary subsistence, education, or *other care necessary for physical or mental health or morals of the child* or * * *. d. That the *parents are unfit by reasons of* debauchery, *intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior,* or *other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.* e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination." (Emphasis supplied.)

Section 28 provides that these hearings shall be without jury and may be conducted in an informal manner, that they may be continued from time to time and in the interim the court may make such orders as it deems in the best interests of the child, and that adoption hearings shall be conducted in accordance with the provisions of laws relating to adoption.

■ ■ II. This cause is in equity and our review is de novo. A jury trial is not required. State ex rel. Bruner v. Sanders, supra; State ex rel. Gilman v. Bacon, 249 Iowa 1233, 1237, 91 N.W.2d 395, 398; McKay v. Ruffcorn, 247 Iowa 195, 198, 73 N.W.2d 78, 80, and cases cited.

Substantial weight must be given to the findings of the trial court who sees as well as hears the testimony at the informal hearing. Finken v. Porter, 246 Iowa 1345, 1347, 72 N.W.2d 445, 446, and citations. We noted in State ex rel. Gilman v. Bacon, supra, in matters of this kind the trial court has before it more than a printed record and exhibits. Such things as the demeanor of the parties, the candor or lack thereof of the witness, the attitudes, real and assumed, and the apparent motives of those testifying, are entitled to much weight in making findings in these matters. Nevertheless, our duty is to pass anew on the issues and we assume that obligation.

III.  We return then to a consideration of the evidence before the trial court, keeping in mind the rule is well established in custody matters that a determination is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past.  Savery v. Eddy, 242 Iowa 822, 838, 45 N.W.2d 872, 47 N.W.2d 230, and 48 N.W.2d 230.  Appellants admit the past record of both Mr. and Mrs. is not good.  There is substantial evidence that Mr. was known as an emotionally disturbed child and was placed in a home for delinquents.  At 18 years he entered the military service and served time as a war-time deserter.  In 1953 he was found guilty of robbery and served a term in the Missouri State Penitentiary.  The report from that institution states he has the characteristics of a psychopath, reacts with hostility whenever pushed beyond what he considers the norm, and that he lacks self-control necessary for good social adjustment.  The history of this marriage has been one of constant friction, of physical violence, of infidelities, and a running away of one or the other of the parties.  There is testimony that Mr. constantly beat and choked Mrs., and once tried "Russian roulette" on her, often threatened to kill his mother-in-law and others, and kept a knife under his pillow when he slept.  In the search for a better job he often left Mrs. and the children with his parents in Missouri, and on one occasion exchanged wives with a brother.

Mr. first met Mrs. in a drugstore in Des Moines and shortly thereafter started living with her although she was then married to Mr. Norton.  The child, Jody, was conceived and born before Norton secured a divorce from her.

Lack of confidence and suspicion generated friction between Mr. and Mrs. and made lengthy separations welcome.  Mr. tried several jobs in other places and, when Mrs. moved back to Des Moines in January 1965, he was employed in Kansas.  Just before he came to Des Moines he had been on a six-week drunk, and Mrs. was forced to obtain work as a housekeeper and live-in babysitter in order to provide for herself and the children.

Mrs. Morrison's final employer, Junior Allie, had lost his wife the previous year.  Mrs. had known Allie before and a romance quickly developed between them.  Soon she began to

share Allie's bed and act like his wife, a situation evident to all the children. There is evidence that Allie's children were delighted when it became known Mrs. was pregnant and would have a baby.

When Mr. arrived in Des Moines, he secured a job as a taxi driver and rented an apartment for Mrs. and their children. Although Mrs. professed her love for Allie and first testified she planned a divorce from Mr. so she could marry him, she also said she was afraid of what Mr. would do to Allie and her mother, and so she came back to Mr. There is evidence Mrs. continued to see Allie romantically up until the latter part of September just before the final hearing herein, that Mr. continued his threats and continued to remind Mrs. of her past misdeeds, and that in this strained and troubled atmosphere both Mr. and Mrs. were constantly upset. They apparently forgot completely their obligation to provide a wholesome home atmosphere for the children. Apparently Mr.'s prime interest was to keep Mrs., and used the children as his leverage. On the other hand, Mrs. continued to love Allie but stayed with Mr. rather than run the risk of again losing her children, a situation which never really changed during these proceedings. In an apparent effort to commit suicide, abort the child, or relieve her anxieties and depressions, on at least two occasions Mrs. consumed many and various pills and became quite ill. Mr. had her hospitalized at Broadlawns General Hospital in Des Moines. The immediate diagnosis was an overdose of narcotics. It was not until just before the final hearing herein, when Mrs. learned she might lose her children, that she resolved to "straighten out her family situation so that the children and she can have normal, everyday living without living in fear." However, in deeds she achieved little or no success and, try as he did, Mr. could not get Mrs. to cease seeing Allie.

After Mr. had Mrs. admitted to Broadlawns the second time, he himself requested admittance due to his high state of agitation and nervousness. Although both parties were released shortly, at Mr.'s request he was then sent to the State Hospital at Clarinda for observation and help. Mrs. ostensibly lived with her mother, but continued to see Allie.

Broadlawns reported Mr. "incapable of a realistic approach to his complex marital and family problems and fails to see his own role in his many difficulties that have beset this family." Their clinical findings concluded, "Despite his declarations of his love for his children I cannot believe that either he or his wife are completely competent and responsible as parents." The diagnosis was "emotionally unstable personality" and recommended the detention of Mr. because of the current emotional upset. The history given was a record of the effects of instability upon these persons and the lives of their children.

The same diagnosis was given as to Mrs., but the recommendation was that she be discharged from the hospital and that both Mr. and Mrs. obtain help from Family Service for marriage counseling. Mrs. admitted her misdeeds, but claims they resulted from her inability to cope with the marital problems created by Mr. Thus both had excuses, but failed to see their part in the solution of the problems.

It was the trial court's conclusion, after the second hearing, that these children "are neglected children within the meaning of the law by reason of being without proper parental care because of the emotional status of both of their parents." It found that, because of the immoral conduct of their mother in conceiving a child by another while married, and by reason of their father's repeated and continued threats to kill various persons, the children were living under conditions with these parents which would be injurious both to their physical welfare and their mental health. The children were ordered returned to the Polk County Juvenile Home pending further planning, and the authorities were directed "to file a petition * * * to terminate the parental rights of these people." No appeal was taken from this adjudication. The petition to terminate then came on for hearing September 28, 1965, before the same judge who had heard the former matter.

IV. At the September 28 hearing it appeared Mr. had been at Clarinda for six weeks, that no psychosis was found, and he had come to realize his own stubbornness and jealous ideas were making the situation desperate. Nevertheless, he continued to look to others for help, including Family Service, but did

little to change his own demeanor. It also appeared the parties had resumed living together. Both testified they had established a new home and were going to work together for the welfare of the children. Mrs. now says the child she is carrying belongs to Mr., not Allie. She now asserts she does not want a divorce and will not see Allie anymore. In summary, the evidence was much the same as in the other hearings, plus the promises of what Mr. and Mrs. would do in the future to correct the admitted unwholesome homelife they had allowed to exist in the past. However, Mrs.' counsel expressed doubt that the children should be placed in their new home until it was clear these parties would be able to behave and get along with each other. It seems significant that Mrs. admitted she had lied to the court before, and also said she would lie again rather than have her children taken away from her, and that she would say anything or do anything to keep her children. Evidently the trial court did not believe the come-lately resolutions by the parties under the situation before it, and neither do we.

In its findings of fact filed October 27, 1965, the trial court stated, "both parents remain as persons of such unstable emotional status that for the children to continue to live with them would be highly detrimental to their well-being", that the father exhibited present instability at the hearing by beating his head with his hands and uttering incoherent remarks, and that "from the court's visual opportunity to assess his actions and credibility it is clearly apparent that he is very disturbed and inadequate and would be completely unable to furnish the bare necessities for a proper development of the mental health or morals of his children." It also found both parents totally unfit to continue in their relationship with their children and referred to the mother's unashamed and persistent conduct with Allie and her fluctuating stories as to who was the father of her unborn child. Her disregard for moral stability and the truth, her attempt at suicide by drugs, and her lack of consideration of the effect of her conduct on them, were likely to be detrimental to the mental health and morals of the children.

This is a history of good intentions, but feeble resistance to temptation and wrongdoing, and little or no consideration for

the unwholesome influences created or the moral and mental welfare of these children. We are not convinced the improvement, if any, is sufficient to delay the opportunity of these children to have a proper home elsewhere.

■■ V. It is well established in matters of this kind that the primary consideration is the welfare and best interest of the child. State ex rel. Gering v. Bird, 250 Iowa 730, 735, 96 N.W.2d 100, 102, and citations. While there is a presumption that the best interest of the child will be served by leaving it with its parents, this is not conclusive. State ex rel. Bruner v. Sanders, supra, 256 Iowa 999, 1007, 129 N.W.2d 602, and citations. Obviously, there was substantial evidence presented here to overcome that presumption. We do not overlook the right of a child to the care, support and affection of his parents, and of the parents' right to custody unless by their conduct they forfeit that right. Nevertheless, we must recognize that the State, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. Stubbs v. Hammond, 257 Iowa 1071, 135 N.W.2d 540; State ex rel. Wiley v. Richards, supra, 253 Iowa 679, 680, 113 N.W.2d 285, 286.

We do not overlook the fact that these children were kept clean and well-fed, that their physical homelife was about average for persons of their parents' means, and that they attended church frequently. We credit the parents for that and, were it not for the obvious atmosphere of unwholesomeness generated by the words and deeds of these parties, we would perhaps be more hesitant to dissolve this parent-child relationship. However, children, like adults, cannot live on bread alone. Indeed, they need more than love. They need and must have proper guidance and must be furnished a healthy mental and moral atmosphere by those who have their custody and control.

■ VI. Appellants finally contend the grounds upon which the court found the children neglected and upon which it terminated the family relationship under section 3, paragraph 15, subs. b, c and d and section 42, paragraph 2, subs. b, c and d are invalid. They maintain the terms and conditions used in this legislation are too broad and vague, that it is an unconstitutional delegation of legislative power to the judiciary and deprives the

parents of due process of law. We find no merit in these contentions.

While it is true the evidence of breach as to the specific grounds mentioned in the statutes is not great, and the trial court seemed to rely on the general grounds, such as, "or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child", these provisions are not invalid as criminal provisions and, in considering their applicability, the court was merely passing upon the sufficiency of the evidence introduced to produce or likely to produce a condition declared to be detrimental to the welfare of the child. As bearing on this question, see City of Des Moines v. Lampart, 248 Iowa 1032, 82 N.W.2d 720; State ex rel. Klise v. Town of Riverdale, 244 Iowa 423, 429, 57 N.W.2d 63. The court is only required here to perform the judicial function of determining whether the facts disclose a violation of the law. There was ample evidence of conditions which would likely be detrimental to the mental health or morals of these children.

In State v. Visser, supra, 249 Iowa 763, 764, 88 N.W.2d 925, we considered the general section 232.2(7) of the 1954 Code, which stated a neglected child shall mean any child who, for any reason: "* * * (7) Is living under such other unfit surroundings as bring such child, in the opinion of the court, within the spirit of this chapter." In upholding this provision, we said that chapter 232 "was enacted more for the purpose of assisting unfortunate children than for punishing them. In classifying those who were intended to be deemed dependent and neglected the legislature named six specific circumstances, any one of which, if found to exist, would warrant such a classification." We pointed out the legislature apparently realized the futility of attempting to formulate a specific meaning of the term to the exclusion of all others, a course that often might defeat the purpose of the chapter, and enacted section 232.2(7). We then held if the evidence showed "Any child living under conditions, though not specifically named, which shock the conscience of the Chancellor may be so classified." Under the new provisions the answer is the same. The legislature has wisely placed the answer to the question of whether the evidence justifies the classification in the

discretion of the court, and in matters of discretion this court will not interfere unless there has been an abuse thereof. Svoboda v. Svoboda, 245 Iowa 111, 60 N.W.2d 859; Rahn v. Cramer, 249 Iowa 116, 120, 85 N.W.2d 924.

Although we find there was substantial evidence of the breach of specific circumstances listed in chapter 215, we are also satisfied the circumstances shown justified a finding that the classification was applicable and that the decree terminating the parental relationship with these children was proper.

The term "morally unfit" has often been considered by the courts and it is the general conclusion that, as applied to parents' relations to a child, it imports moral delinquency. Of course, no single or isolated error or misstep by the parent is sufficient, but a present immoral course of conduct by the parent which is likely to affect the child living under that environment is contemplated under this classification. The word "unfit" generally means unsuitable, incompetent or not adapted for a particular use or service. Richards v. Forrest, 278 Mass. 547, 180 N.E. 508, 510. Also see Words and Phrases, Volume 43, page 219, and citations.

In the recent Wisconsin case of Belisle v. Belisle, 27 Wis.2d 317, 134 N.W.2d 491, 494, that court upheld a decision finding the mother "emotionally unstable" and declared her unfit to have the custody and control of her child. An emotional disturbance of a parent, the court said, which would make it harmful to the minor child's welfare, is tantamount to a finding of unfitness within the meaning of their statute, quite like our own. Also see In re Hudson, 13 Wash.2d 673, 126 P.2d 765; In re Johnson, 9 Wis.2d 65, 100 N.W.2d 383; 67 C. J. S., Parent and Child, section 12, page 652, note 46; In re Sweet (Okla. 1957), 317 P.2d 231.

VII. Viewing the entire record and exhibits in a light most favorable to the parents and indulging in every presumption in their favor, we are forced to the conclusion that the best interest of these children requires that appellants be permanently deprived of their custody and control and that they be held for adoption, where, as we said in State ex rel. Gilman v. Bacon, supra, they may have not only clean bodies and ample food,

clothing and shelter, but love, affection and security, free from unwholesome influences, morally and mentally, as they grow up to adulthood.

The judgment of the trial court must be affirmed.—Affirmed.

All JUSTICES concur.