In the Interest of Betsy **LOEFFELHOLZ** and Timothy Loeffelholz, Children.

JoDee **LOEFFELHOLZ** and George Loeffelholz, Appellants,

v.

**STATE** of Iowa, Appellee.

No. 53125.

Supreme Court of Iowa.

Nov. 12, 1968.

Fuerste & Carew, Dubuque, for appellants.

Alan Kean, Dubuque, guardian ad litem for children.

Michael S. McCauley, Dubuque County Atty., and Richard P. TeKippe, Asst. County Atty., for appellee.

LARSON, Justice.

In these juvenile proceedings brought under chapter 232 of the Code on June 18, 1966, the court found Betsy, age 2, and Timothy, age 1, children of George Loeffelholz, age 25 and JoDee Loeffelholz, age 22, were neglected. Pursuant to hearing on August 16, 1967, it ordered the parent-child relationship with them terminated. When the court denied the parents' petition to vacate the judgment on October 25, 1967, only the mother perfected an appeal. The status of a third child, Tony, born to this union on April 29, 1967, is not involved in these proceedings. As in most cases of this nature, the issue is largely factual and calls for an extensive examination of the relevant and material evidence.

An action charging child neglect was instituted on May 27, 1966, at the direction of the juvenile court after being informed by a child welfare worker of the Dubuque County Department of Social Welfare (hereafter called the department) that these children were without proper parental care. Notice of hearing was given on May 27, 1966, and the parents appeared personally and by written appearance.

Present at the hearing on June 18, 1966, besides the parents, were a child welfare worker, a probation officer, and the paternal grandmother. After hearing the testimony and recommendations of the authorities, the court found these children were then without proper parental care, continued the proceedings, and directed that they should be placed in the temporary custody of the department with authority to place each in a suitable foster care facility at the expense of Dubuque County, Iowa. A written report from the department within 60 days was required, including the instant circumstances of the parents. Apparently nothing was done at that time, but on December 9, 1966, a "rehearing" of the matter was had, at which time the parents, a child welfare worker, and a deputy probation officer were present. The court then found the temporary custody should continue for a period of six months unless sooner terminated by order of court, and required another report from the department at that time.

On July 27, 1967, a petition was filed in the district court by an employee of the department stating she had knowledge which indicated the parent-child relationship of these parties should be terminated, and asked the court to set the matter for hearing and prescribe notice, to be served upon the parents, the department, and the guardian of the persons of the children, if any, including the guardian ad litem to be appointed for the minor children. This application came on for hearing on August 16, 1967, and after the court had recited the circumstances preceding the hearing, it stated:

"* * * All parties were present and represented by counsel. After introduction of evidence the matter was marked submitted to the Court. Since the original adjudication of neglect because of the immaturity of the parents and lack of proper parental care resulting therefrom, the father has been earning a net take-home pay of $80.00 a week in regular employment. However, despite an adjudication of bankruptcy in the late summer of 1966, the parties have been unable to save any money or even provide for their own needs.

"In the last six months the following has transpired: The husband and wife have fought rather frequently; the husband has demonstrated the basic desire to avoid responsibility; the mother has been arrested twice for issuing N.S.F. checks and she is now on parole for such offense; the second flurry of bad checks was a parole violation by the mother; the parents have not seen this child since early June; the father does not know how he can support the child; the mother has evidenced lack of normal maternal concern about the child's health.

"The child has been away from his parents since May 27, 1966, and it is imperative that a definitive pronouncement be made at this time."

The court then found that, following the adjudication of neglect, reasonable efforts under the direction of the court have failed to correct the conditions and solve the problems of these parents, and ordered that the parent and child relationship between George Loeffelholz and JoDee Loeffelholz, as parents, and the children, Betsy and Timothy, be terminated, and transferred the guardianship of the children's persons and the legal custody of them to Catholic Charities, a licensed child-placing agency in Dubuque, Iowa.

On or about September 21, 1967, the parents obtained new counsel through Legal Aid and filed a petition asking vacation of the August 19th judgment and a new trial, in which they alleged inter alia a violation

of their constitutional rights, a lack of understanding of the effect of the June 18, 1966, hearing, a failure of the department to fully advise them thereof, a lack of knowledge as to how to defend their material rights. They also alleged that they have newly-discovered evidence not available at the prior hearing which would be material to a proper disposition of the matter, that they are "well and able to care for their natural children and made numerous efforts to recover custody" of them without success, and that it would be for the best interest of the minor children for the court to grant their prayer therein. Hearing on their petition was set for the 20th day of October, 1967, and notice prescribed on the interested parties therein.

Pursuant to this hearing, the court found nothing in the testimony and arguments submitted convincing it of its error in the judgments and decrees heretofore entered, and nothing in the evidence or arguments submitted by counsel to show any invasion of the constitutional rights of the petitioners. It further found:

"3. A portion of petitioner's testimony and argument seems to be directed to the hearing held June 18, 1966, with a claim by them that they did not understand what they were doing when they signed the appearance and that they never received any notice of the hearing. The court does not find that the return of service has been rebutted. All parties appear to agree that the children were in fact abandoned and neglected at the time of the hearing and had an opportunity to deny that their children were neglected but they did not do so then and they do not now deny that their children were neglected on June 18, 1966.

"4. At the hearing held on or about August 19, 1967, the parties were represented by competent counsel and if any of their rights were being infringed upon their counsel surely would have invited the court's attention thereto.

"5. Petitioners made claim of new evidence but the only new evidence proffered was that of the witness Mrs. James Ingles,

the person with whom petitioner Jodee Loeffelholz stayed when she abandoned her children in May of 1966.

"6. Petitioners claim that the representatives of the Iowa Department of Social Welfare, in effect, conspired to deprive them of their children whereas, in fact, the Dubuque County Department of Social Welfare and personnel in its employ provided for these children the care and affection petitioners were unable to provide while they were indulging themselves in their immature responses.

"7. Since the entry of the decree under attack, George Loeffelholz has once more changed his employment, the parties have once more moved their residence, they are still making payments on $30.00 worth of bad checks and, in all, have failed to show any observable gain in their efforts to achieve maturity.

"8. These petitioners have been admirably dogged and persistent in seeking the help of others to escape their predicament but seem to have done little to help themselves. The situation approximates, to some degree In Re Morrison ([259] Iowa [301]), 144 N.W.2d 97 * * *."

The court said it was not convinced the improvement, if any, was sufficient to delay the opportunity of the children to have a proper home elsewhere, and denied the parents' petition for vacation and for a new trial. In our opinion the record fully sustains these findings and conclusions.

The appeal to us is prosecuted by only the mother. We are advised by stipulation of counsel that on May 8, 1968, George Loeffelholz obtained a divorce from JoDee Loeffelholz on the grounds of cruel and inhuman treatment, that the mother was awarded custody of the baby, Anthony Loeffelholz, and that she married Larry Bedtka in Galena, Illinois, on June 7, 1968. There was no mention of the children Betsy and Timothy in that divorce decree.

■ I. In a proceeding to have children declared neglected and to declare the

parent and child relationship terminated, our review is de novo. Code section 232.-58; In re Morrison, 259 Iowa 301, 306, 144 N.W.2d 97, 100, and citations.

■ Nevertheless, we give weight to the fact findings of the trial court, especially when considering the credibility of the witnesses, but we are not bound by them. In re Morrison, supra; In re Yardley, Iowa, 149 N.W.2d 162, 166; rule 344(f), par. 7, Rules of Civil Procedure. The rule is applicable here due to the fact that some of the State's evidence consisted of reports from the social workers received under the provisions of section 232.46 of the Code. Although some of the statements in the reports were contradicted by the parents in open court, the parties making them also testified in open court and were cross-examined.

■ II. In custody matters the rule is also well established "that a determination is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past." In re Morrison, supra, at page 307 of 259 Iowa, at page 100 of 144 N.W. 2d. The case at bar is a classic example of the wisdom of the rule. The marital relation problems which caused the alleged neglect and resulted in severance of parent-child relationship did not get better, but broke down completely in 1968, and we are not advised that the changed circumstance has solved appellant's problems.

III. Appellant has assigned as errors that (1) the court erred in terminating the parental relationship between Betsy and Timothy and their mother under the facts revealed by the record, and (2) the authorities failed to carry out the provisions of chapter 232 of the Code as contemplated, especially as to section 232.28 relating to proper advisement as to her right to counsel and as to section 232.32 relating to her right to a stenographic record. In other words, it is her contention that under the whole record the evidence does not justify the termination order or the finding that

she received due notice of and waived her right to counsel at the June 1966 hearing and her right to a stenographic record of that hearing, all to her prejudice. We can agree with neither contention.

As to the first error, the law applicable was carefully considered by us in In re Morrison, supra, and In re Yardley, supra. Counsel takes no issue with those announcements and we need not repeat them here. Our principal concern is with the facts, and we consider them in some detail.

■ IV. The record clearly sustains the finding of neglect prior to June 18, 1966. The court's file contained a duly executed return of service on each parent, the written reports of the department, and the "juvenile appearance" signed by each parent and witnessed by two persons, which stated: "We, the undersigned parents * * * having examined the petition now on file in the above-entitled action and being familiar with the contents thereof, hereby enter our appearance and consent to the jurisdiction of the court. We further state that the facts set out in the petition are true. We also have been informed of our right to legal counsel and waive the same, together with stenographic record of the proceedings."

In ordering the filing of this neglect petition on May 27, 1966, the court had required a preliminary investigation thereof. Although we have no record of that hearing, the circumstances and conditions related in the written reports which caused this hearing are clearly evident from testimony given at the later hearings. Mr. Loeffelholz, hereafter called George, in the termination hearing verified the department report that he "voluntarily approached Welfare for help" after his wife left him and the children in May 1966. The report also set forth that this family, with Betsy then two years of age, and Timothy one year of age, was not doing well. Continued quarrels, insufficient income, continued job changes, and a desire of both parents to avoid responsibility, indicated they were unable to properly care for these children.

The paternal grandmother had complained to the department of the unclean clothes and bedding for these children and objected to the boy babysitters used while the parents were out playing cards or bingo. These reports alone disclose the "immaturity" of the parents. The lack of domestic tranquility, the court felt, was due to immaturity, and therefore did not order an immediate hearing on severance. It wisely provided that the children should be placed in foster homes for a period to see if the natural parents would resolve their difficulties and justify the return of the children. Apparently this action satisfied the parents and no complaint was made thereto until after the termination hearing was concluded. Although the appellant now contends she did not understand that proceeding, she does not claim or disclose any grounds defensive of that action.

We believe the June 21, 1966, decision was the only reasonable conclusion the court could reach under the circumstances, and hold the evidence before the court required an adjudication of neglect.

V. Pursuant to the petition filed by a welfare worker on July 27, 1967, alleging that reasonable efforts under the direction of the court had failed to correct the conditions leading to the neglect adjudication and asking that the parental rights be terminated, the matter was heard on August 16, 1967. All parties were present and were represented by counsel. In addition to the information contained in the reports, studies, and examinations of the department, the State presented testimony of Mrs. Mantei, a well-qualified social welfare worker who gave this case her special attention from February 27, 1967, Lou Mae O'Reilly, a deputy probation officer, and the parties who operated the foster homes where these children resided after May 27, 1966, Mrs. Wiederhold and Mr. Hall. Besides Mr. and Mrs. Loeffelholz, Bernice Crain, the mother of JoDee, Betty Ingles, a friend and frequent visitor in the home, and Dr. Elvin E. Olin, testified for the natural parents.

Mrs. Mantei testified she took over this case after JoDee had had an altercation with the former social worker which resulted in lost visitation rights for a month. On March 1, 1967, she had an interview with Mr. Loeffelholz and discussed the marital problems with him. He informed her he was unable to completely trust his wife because of past affairs. After re-establishing visitation rights between parents and children, Mrs. Mantei allowed the natural parents to make their own time arrangements with the foster parents. She received reports from the foster parents and, while at first these visits caused disturbing reactions in the children, they were getting along better as time passed. She said George was preoccupied with the past and was not convinced marital progress had been made. Existing financial problems had not been solved. On April 29, 1967, when Tony was born, George had to hunt an apartment to rent, for the trailer home which they had purchased had been repossessed. There were no visits with Betsy and Timothy from April 19 until May 15, occasioned by Tony's birth. On May 11 Mrs. Mantei visited the home and discussed the situation with the parents.

On May 31 the deputy probation officer informed Mrs. Mantei that JoDee was writing bad checks, and Mrs. Wiederhold reported George had talked to her about his marriage, his wife, and the children. She reported he was uncertain about the marriage staying together and feared he might do "something rash" to the children when he was upset, that he thought it would be better if he would "just run out and leave," and that he "felt adoption was best for the children." Thereafter George communicated with Mrs. Mantei by letter which stated, in substance, that Betsy and Timmy were being properly cared for in a foster home and he was afraid if they were returned they would only be hurt further. He asserted both he and JoDee loved the children, but questioned whether JoDee loved them enough to be a good mother, and thought he should leave and join the Navy, which he could do with

only one dependent. On June 13 both parents conferred with Mrs. Mantei and, at George's request, JoDee was given the aforementioned letter. On June 21 George again told Mrs. Mantei he wanted to be relieved of his family responsibilities and join the Navy. JoDee would not communicate with the worker in depth about her feelings and desires. Mrs. Mantei's efforts had been to re-establish the home and reunite these parties, but it was her opinion that these parents did not have the ability to maintain a home for these children, and stated, "I do not feel Mr. and Mrs. George Loeffelholz have the capacity to give these children security and love as parents." She did not feel she could state whether there had been any material change in conditions since the December hearing following the neglect finding. She also said George's aunt called her and said George had been searching Dubuque for her the night before, with the intent to have Tony also placed in a foster home, because JoDee was going out to bingo games and not caring for the child.

Mrs. Mantei also testified as to JoDee's attitude when she was questioned about the writing of bad checks. She said: "I confronted her with the question of what would happen to her family, to her children and to her husband, if charges were pursued because of this, and if she would therefore be incarcerated, and she stated very nonchalantly to me that * * * she guessed they wouldn't have a family. * * her attitude toward the children * * * was one of lack of concern."

On July 6, 1967, George and JoDee Loeffelholz were told of the social worker's recommendation and what the results could be. The report of the Dubuque County Welfare Office (Exhibit 1) was also offered and admitted into evidence.

The deputy probation officer testified that JoDee was placed on probation for one year on January 10, 1967, after being charged with the crime of uttering a false check, that in May her attention was called to other similar activities, and that JoDee was taken back to court on June 27, 1967, where her case was continued after she promised to reimburse the people to whom she had given these checks. The officer testified that when they "discussed what repercussion this might have on her family, it didn't seem to bother her too much."

Mrs. Wiederhold, with whom Timothy resides, said the child at first was shy with his parents like they were strangers. He appeared afraid and would be overtired when they brought him back. He would awaken in terror, but that this had not occurred recently. At first, the natural parents were not prompt in getting and returning the child, but later were "right on the dot." On one occasion when JoDee came to visit alone, Timothy did not know her. Friends brought her and, when they came to pick her up, Mrs. Wiederhold noted there were several teenage boys and one girl in the car. On one occasion when George came alone, they had a conversation about his marriage. He told her "he wasn't entirely happy with the way his marriage was and that he couldn't seem to please his wife," and that "it made him sick to go to work and have the guys talk about his wife to him." Another time in the latter part of May when George came alone, he said his wife "had gone to a bingo party and he was bringing the children home." On that occasion she walked to his car and saw the baby Tony alone in the back seat of the car. Tony was only six to eight weeks old then. Mrs. Wiederhold also said he told her he had written a letter to Mrs. Mantei about his marital status. She recalled an occasion when Tim had been given a D.P.T. booster shot and George and JoDee came to take him to supper. She informed the mother that Tim was feverish and had taken aspirin, but they took him anyway. Although she asked them to give him aspirin at five o'clock they failed to do so so, and when Tim was returned he was very sick for about three days. His temperature had risen to 105. She further testified that

George had said he didn't think the marriage would work, that he didn't know whether he could keep himself from running away, that while JoDee thought everything depended upon their getting the children back, he knew that wasn't so, and that "they had more problems than they could cope with then." She further said he repeated these assertions on at least four occasions.

Mr. Edward Hall, in whose home Betsy lives, testified she seemed shy and strange the first few times her natural parents visited her after January 2, 1967, and she had a bad reaction from the visits, but since then she is excited and eager to go with them, especially her father.

VI. George Loeffelholz testified as to the separation in May 1966 and said they went back together in November 1966. He admitted he voluntarily approached the welfare department for help, and said they promised to give him time to get things straightened out. When he was left with the children, he took them to his mother. She called the social welfare department because she couldn't care for them. Charges were then filed in court "about the children being dependent and neglected." He said, "We have had a rather rocky marriage and have had some money problems * * *." He took bankruptcy in July 1966. He knew the children were placed in foster homes and said, since his wife and he had gone back together, they visited the children "fairly regularly." He acknowledged writing a letter to Mrs. Mantei, but said the reason was that "about fifty people" were telling him what to do and he was all mixed up. He asserted that his wife and he had been getting along since they went back together in November 1966 and were not fighting now. He felt they had a happy home life, that it had improved, and expressed the opinion that if the court gave the children back to them, they would be able to make a good home for them. He said his wife was capable of taking good care of the children.

George recalled his wife's difficulty in writing bad checks, but said all were paid off except one or two. He recalled a conversation with Mrs. Wiederhold concerning the children's future and asked her if foster parents could adopt them. However, now he was not interested in anyone adopting them, for he thought he could give them love and affection and properly rear and educate them. He thought his wife could do likewise, that there had been a change in her in the past year. It was his belief that the children wanted to stay with them at visitation periods.

George admitted that prior to their separation in May 1966 he and his wife fought and couldn't get along. At that time he filed for a divorce, but apparently dropped the suit when they went back together in November. He explained their fights or quarrels were due to his card playing and her bingo parties, her departure to Texas on a trip after they separated, and his letter to Mrs. Mantei in June 1967. He claimed he now had a good steady job and a large roomy home for the children. He had not reimbursed the welfare department for the children's support, but had no unusual family expense in connection with the arrival of Tony, and denied he complained of others discussing his wife since the first of the year. He said the letter to Mrs. Mantei was the result of an argument with his wife. He admitted he discussed the letter with Mrs. Mantei and that he told her he meant what was said therein.

JoDee testified she and George were married in May 1963 and separated in May 1966. She said their problems started when George was not working and lots of bills piled up. The Social Welfare helped him get on a training program at Flexsteel at about $30.00 per week. She was also working there at the time trying to help out. When her father and both grandfathers died suddenly, she couldn't stand the pressure and left. She didn't know where the children were, but then learned George had taken them to his mother's, who

couldn't care for them, and that the welfare department had them. Reconciliation attempts in July and August were thwarted by relative interference, but they finally went back together in November 1966. She maintained they had been getting along fine since that time, that she is not employed, and that they have a child three months old who is receiving good care in their home. No child welfare investigation of their home has been made since this child was born, and no neglect charge has been filed as to him. She testified they had made frequent visits to the child welfare office trying to get Betsy and Timmy back, but that they were always told to wait a little longer. She was convinced the department was not trying to reunite the family, but continued to bring up past events, which upset them so much they would fight with one another. She liked Mrs. Mantei at first, but of late even she kept telling them that their marriage wouldn't last. JoDee said the foster parents never complained to her about the visitations with the children and, although she recalled the time Timmy was sick, she did not believe he had a fever that evening for he played real well with Betsy. It was her belief that she and George *had rehabilitated themselves* and could provide a happy family relationship if the children were returned to them. There was no possibility of a breakup at the present time.

JoDee said she liked to play bingo and usually went with her mother or George to the games. The bad checks have all been paid except two. She expressed love for her children, a desire to have them back, and promised love and kindness toward them in a good home. She was sorry for her mistakes and asked another chance. She was only 18 years of age when they were married, and was 22 years old when she testified.

JoDee explained that she wrote the checks for things they needed at the time. She intended to put money in the account before the checks came in, but didn't get the money to cover them. She used to play bingo twice a week, but lately hadn't done so.

JoDee told the court she and George did not fight about bingo the night he wrote the letter to Mrs. Mantei. She said he was upset because he had to leave Betsy the night before, and the foster parents had not referred to them as mother and dad, but as George and JoDee. She said they bought shoes for Timmy and a suit for Betsy near Easter, and that she had always kept the children and their clothes clean. She vigorously denied the truth of a reported claim that the children were "quite filthy," and their bedding urine-soaked. She admitted her children had more clothes than the average child, but said they were mostly hand-me-downs, not new. She further told the court that the money George brings home is enough for them to live on, and explained the check financial crisis at the bank was caused when they hurried to pay up all bills, including hospital and doctor bills, and obtain things needed before they reassumed the custody obligation of these children.

VII. In the hearing on the natural parents' petition to set aside the termination judgment George and JoDee testified much as they did in the former hearing. They admitted being represented by counsel in the termination hearing, but denied they ever received a copy of the petition of May 27, 1966, alleging the neglect of these children, or of being informed of their right to counsel and a stenographic record at that hearing. Both said they were not advised as to the import of that proceeding and, had they known of these things, they would have contested that matter and refused to sign the paper referred to as an appearance. JoDee admitted they signed that appearance on the date of the hearing, but denied she ever saw the petition or knew of its contents. She claimed Mrs. Keebler, a social welfare worker, told her it was a paper "if the children had gotten sick at any time * * * while they were in

Welfare, that they could go ahead and have a doctor * * *." She didn't recall whether or not she read the paper they signed. To the question, "Did you understand it or was it explained to you that what you signed could later be used against you in making a determination that parental rights between you and your children should be severed?", she answered "No." She further stated that, had she known they could have an attorney appointed for them, they would have wanted an attorney at the original hearing, and that they never intended to give up their natural rights to the children, but only to allow the welfare department to care for them while she and George got their problems worked out. She understood, if they didn't get those problems solved, either she or George would be given their custody. Neither wanted them adopted out. She further testified she did not understand what a stenographic record was at that time, but now understood it to be a court reporter's notes of the proceedings. Had she understood it, they would have wanted a record of the entire proceedings. JoDee also testified that they knew they could have an attorney at the hearings, but that all the December hearing was to decide was whether another six months was to be given them to solve their problems. They did not realize these hearings could lead to a severance of their parental relationship with the children.

JoDee further said they were continually led to believe that custody would be returned to them eventually, that they were told they were making very good progress, and that until George wrote the letter to Mrs. Mantei while emotionally upset, their hopes were about to be realized. She further told the court that George had been working at Dubuque Stamp for about a year and a half, but about a month ago or shortly after the last hearing he quit that job and was now employed at the Packing House. She admitted they had again moved in August 1967 because they found out the place they had was hard to keep warm. Their residence now was 1335 Bluff Street, heat was furnished, and all their bills were paid. Although the court pointed out to her that the sworn-to return of service of the June 1966 hearing stated the notice was served by reading the notice to her and leaving a true copy thereof with her, she still denied ever having a copy thereof. She did not remember signing the consent to jurisdiction (appearance) in Mr. Vogt's office in the presence of the witnesses listed thereon.

George gave like testimony, and JoDee's mother, Bernice Crain, testified her daughter took good care of the children before the May 1966 separation, and now keeps her home in reasonably good condition.

The court referred to the social welfare investigation in connection with the June 1966 hearing, which said, "* * * this family has been off and on General Relief since March 4, 1964, for food, etc. In July 1964 when Betsy was five months old, a complaint was made to the Child Welfare Department by Mrs. Walter Foecking, paternal grandmother, that the baby was left with inadequate boy babysitters, she was not fed properly, and that the apartment was unclean and the baby left with urine soaked clothes while the mother went off to play Bingo." The court also referred to agency records covering the period prior to May 12, 1966, which showed George had not held a job for any length of time. In the past two years he had worked at Dubuque Packing, Trausch's Bakery, and the Hubbard Walnut Company. They also disclosed George complained of his wife's expenditures for clothes for herself and children when he was only making $48.00 per week, that she wanted to play bingo every night, and walked out on the children, and that he stated "maybe they were both unfit as parents and the children should be placed for adoption." These facts were not challenged, but some reports were denied.

Betty Ingles testified she visited frequently in the Loeffelholz home prior to

May 1966 and "it was clean and the kids were clean." She recalled that Betsy had a big bed to herself with a plastic cover over the mattress, and Timothy's crib had a plastic crib mattress. She liked to visit there since they were back living together. The house was kept clean and they did not have alcoholic beverages in the home. Her opinion was that George and JoDee got along "real good," better than before 1966.

Alois Vogt, the Dubuque County probation officer, then testified as to their practice in having appearances signed before a hearing on such matters. It was his practice to open the file and show the parties the petition and explain the purpose of the appearance. He said the appearance states basically that what the petition states is true, that the parties waive the right to counsel and a stenographic record. He could not recall this instance specifically, but said there was no reason to believe this case was handled any different than ordinarily. He said there is no intent at the time of the first hearing to sever the parental rights. The severance action comes later when the department feels their efforts to work out the disturbing conditions have not succeeded. While they normally did not discuss the consequences of failure or attempt to scare the parents in these situations, they considered it "part of their therapy * * * is instilling in these young people the fact that it is extremely important that they shape up * * *." He made it clear that these young people were given a year or more to correct the situation. They recognized the parents' rights, but felt the children have inherent rights also and that it was most important that they have a decent home, love and affection, and a set of responsible parents. He assumed these procedures were performed on the same day of the hearing, June 18, 1966, and the papers were executed immediately before that hearing. We applaud these objects and purposes.

An examination of the department's reports relating to Betsy and Timothy Loef-felholz discloses the circumstances substantially as related in the open hearings. The testimony given verified the reports and the witnesses were available for cross-examination.

The primary question in this appeal as to whether the evidence is sufficient to support a decree terminating the mother and child relationship in this instance must be answered in the affirmative. The same judge presided in all these proceedings. He saw and heard the witnesses and gave the appellant JoDee Loeffelholz and her counsel the opportunity to refute the reports of the department which tended to show the irresponsibility of the parents prior to the determination of neglect. Even considering the testimony of George and JoDee, we are convinced these parties failed to properly care for these children prior to June 1966, failed to work together in harmony, and had voluntarily surrendered custody and care of these children to the department. JoDee had abandoned the home for pursuits which at the time gave her more pleasure. To be sure, the antics of both parents indicate immaturity and childish irresponsibility. But these small children could not await their parents' maturity. They needed a home with some security, love and adequate care. Apparently no one, except the department, would take or care for them, and the court, upon being advised of the situation, could do nothing but find the children here neglected (Code section 232.3) and place them in the care and custody of the department with authority to place them in foster homes at county expense.

Even then, ample time was given these parents to re-establish a suitable home for the children, and social workers tried to aid them to overcome their problems. These parties could not satisfactorily settle their differences and neither had confidence in the other. Their resolves and assurances have not materialized, they are now divorced, and JoDee has a new hus-

band. Apparently the fears of the department were justified. George can now join the Navy, and JoDee has, we hope, a more adequate husband and a proper home for the baby Tony. She continues to assert her right to Betsy and Timothy and perhaps, had this new circumstance been before the trial court, such a solution to her problem might have been feasible. However, as we have often stated, the primary consideration is the welfare and best interest of the children, determined as of the time of the hearing in such matters. In re Morrison, supra, 259 Iowa 301, 311, 144 N.W.2d 97, 103, and citations. We said therein: "We do not overlook the right of a child to the care, support and affection of his parents, and of the parents' right to custody unless by their conduct they forfeit that right. Nevertheless, we must recognize that the State, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. Stubbs v. Hammond, [257 Iowa 1071,] 135 N.W.2d 540; * * *. Indeed, they (children) need more than love. They need and must have proper guidance and must be furnished a healthy mental and moral atmosphere by those who have their custody and control." Also see In re Yardley, supra, Iowa, 149 N.W.2d 162, 167. There was ample evidence here to justify the court's conclusion that these natural parents were unable or unwilling to provide the care and support necessary for these children and that they gave no promise of being able to do so. The termination decree was justified and we are not persuaded it should be reversed.

VIII. Appellant JoDee's contention that she did not receive due notice of the June 18, 1966, hearing, was not furnished a copy of the petition filed in the matter, and did not knowingly waive her right to counsel and a stenographic record, cannot be accepted. The trial court did not believe her, and neither do we. Whether or not she contemplated the effect of the hearing or would have taken any other action at that time if she had,

we do not know. It appears she could read and reasonably understand what she read, that the papers served upon her apprised her of her parental rights, and that she did attend that hearing. The court was not made aware of any misunderstanding as to the nature of the hearing. It does appear these parents did effect a reconciliation and try to justify a return of custody to them. We think they fully understood the proceedings and tried to comply with the conditions to regain custody.

Appellant further contends she was entitled to a full explanation of the consequences of an admission on her part that the children were neglected before making such an admission, that she was entitled to be told that the court would appoint counsel, if she desired and was unable to secure counsel, before she signed the waiver.

True, section 232.28 provides the parents "shall have the right to legal counsel. If the * * * parents * * * desire but are unable to employ counsel, such counsel shall be appointed by the court." Section 232.32 also provides: "Stenographic notes or mechanical recordings shall be required in all court hearings as in other civil cases unless the parties waive the right to such records and the court so orders."

Apparently she claims these explanations were not given. Of course the trial judge should determine in a proceeding such as this whether the right to counsel and record of proceedings has been knowingly and voluntarily waived. It was justified here in concluding these matters were fairly explained by Mr. Vogt and we cannot disagree under this record. It also appears she was informed by Vogt as to what would likely be the result of the hearing regarding the care and custody of the children in view of the admission, and we think that was sufficient. If, by consequences, she claims she was entitled to be advised as to all the legal consequences of a finding of neglect, we cannot agree. It was made clear to the parents that if they could show to the department's satisfaction

that they were able and willing to provide a suitable home for the children, they would be returned to them. This clearly was the understanding, the thing they worked for, and no complaint as to that determination was registered in the December hearing before the court when she had counsel, or until the petition for termination was heard and decided. No substantial failure on the part of the department was shown and no prejudice appears as a result of the alleged inadequate explanations.

◼ Appellant contends that parents in these proceedings are like those charged as criminals and that the State must show an intelligent waiver of a statutory right to make it effective. Although we have often said these proceedings are not criminal in any way, we do believe the parents might avoid, at the proper time, the effect of a waiver not intelligently made. We are convinced no such showing has been made herein. In any event, it is clear the record before the court at the June 1966 hearing justified the court's decree and no prejudice appears.

◼ Clearly, the petition filed herein called the attention of these parents to the provisions of section 232.28 and 232.32, and that after being advised by Mr. Vogt as to those rights, the parents waived them. The trial court concluded these warnings were given, that they were knowingly waived, and that appellant did not desire anything at that time but relief from the care and custody of the children until she and her husband could arrange their affairs and resume their responsibility for the children. We agree. Unfortunately for these parties, that day did not arrive, and we are satisfied from this record that the best interest of these children is accomplished by the termination so that they may each be adopted into a proper and suitable home.

Affirmed.

All Justices concur.