**In re in the Interest of Bruce Allan WARREN, a Child.**

**No. 53990.**

Supreme Court of Iowa.

June 23, 1970.

Charles E. Vanderbur, County Atty., Ames, for State-Appellee.

Maurer & Jones, Ames, for Allan B. Warren, Appellant.

UHLENHOPP, Justice.

We have here to decide whether the relationship between Allan B. Warren, father, and Bruce A. Warren, son, should be terminated. Secs. 232.41–232.49, I.C.A. The mother of the child consented to termination of her relationship to him.

Allan B. Warren is 30. He is the son of Albert and Josephine Warren and was reared mainly in Story County, Iowa. Albert Warren attended school through the fifth grade and is a laborer; Josephine Warren, a housewife, attended school through the seventh grade. Albert has difficulty relating to people; Josephine is more aggressive and has intermeddled in Allan's marriages. Albert and Josephine have two daughters and two sons: Lois, who is characterized as the only Warren who can control her temper; Margaret; Roy, who has spent about 13 years in prisons; and Allan. The Warrens are known for bad temper, and Allan has been hot-tempered and abusive to the point that neighbors have been afraid of him.

Allan attended school through the sixth grade and was in special education. He is of limited mental ability and never learned to read or write, except his own name. As an adult he has had numerous jobs, usually for short periods, and he has a poor record of employment stability. He endeavors to obtain his way in disagreements by temper tantrums or by threatening to lose his temper. He is not, however, given to drinking.

Allan first married Ilene Ballard. Ilene had previously given birth to a daughter out of wedlock. This caused much difficulty between Allan and Ilene after the marriage, and the child was placed for adoption. Allan completely dominated Ilene in all details of her household duties and other activities, and, as she was an inadequate person and had poor health to begin with, the marriage became a shambles. Allan let his violent temper have full sway, gave her severe beatings, was jailed, and on one occasion locked her in the basement and put a bowl of food on a step for her. Sometimes outside help was called in to stop fights.

Allan and Ilene had two children, Tina and Danny. Those children were exposed to this atmosphere and were shuttled back and forth between this home and the home of Albert and Josephine. In the process

they sustained emotional damage. The Ames Municipal Court, sitting as the juvenile court of Story County, was petitioned to intervene and brought the two children under its jurisdiction.

Ilene developed such dislike for Allan that she eventually divorced him. The divorce court deferred to the juvenile court as to the children, and the juvenile court placed them in the home of Albert and Josephine but gave Allan custody. Subsequently Ilene died.

In 1965 Allan married Mary Todd. Mary had not been married before and had no children. She suffered from epilepsy which may have originated in childhood when her father while drunk threw her against a wall. Allan brought Tina and Danny into the new home, with permission of the juvenile court. Eventually Timothy was born to the union of Allan and Mary, but trouble soon developed. Allan administered the same treatment upon Mary as upon Ilene. Mary developed extreme animosity toward Allan because of his abuse.

By this time the emotional condition of Tina and Danny was deteriorating badly. Tina had tonsil trouble too, and the juvenile court caused her to be examined fully at The University of Iowa Hospitals. Allan and Mary were also examined. The psychiatric report on Tina was, "Tina is a child with many unmet emotional needs who pathetically reaches out for other people. She has a poor self-concept, seeing herself as stupid and even crazy. Her drawings suggest confusion about who belongs to her and to whom she can turn for warmth and support." Danny was studied by another physician who reported, "As of the present time he, I don't think, knows to whom he belongs, how long he will stay anywhere and has very little ability to trust anything." Regarding Allan and Mary it was reported, "Both are immature, dependent, and unable to strengthen the home situation to make it a positive place for the children." Of Danny it was concluded, "Also I think it should be said that unless this boy is given some kind of per-

manent home, at least for two or three years at a time, it is exceedingly likely that he will then develop permanent personality distortions which would be very difficult to reverse." Of Tina, "The basic need of this child is that of her brother's for permanent placement and adequate guardianship."

The juvenile court held a hearing and terminated the parental relationship between Allan and the two children, and they were subsequently adopted by others.

That left Allan, Mary, and Timothy in the home. Mary became pregnant again. The situation became impossible between Allan and her, with his domineering treatment, ungovernable temper, and abuse. On one occasion in a fit of anger he threw away vegetables she had prepared for a meal—he did not like green vegetables. Another time he threw Timothy into the snow for crying. Still another time he turned off the heat in December, and Mary was forced to go to friends with Timothy. Once he burned Mary's back with a live cigarette. He blacked her eyes. She gave false explanations to her parents for the marks and bruises from his blows.

Eventually Mary left Allan, taking Timothy with her. After the separation she gave birth to Bruce, the subject of the present proceeding. Bruce arrived August 22, 1967.

Mary thought she would not get support from Allan and that Timothy was all she could handle. Before she was delivered of Bruce, she resolved that the coming child ought to be adopted by others for the child's own good. She testified the decision was hard to make, and "it tore me apart even in the hospital. I cried at night. I still do."

But she went through with her resolve, never saw Bruce, and asked the Story County Department of Social Services to take him. The Department found a foster home, but Bruce had chronic ear infection and required more time than the first foster parents could give. On March 25,

1968, the Department placed him in the foster home of Harold and Edna Whetstone in Ames, who have children of their own as well, and he has been there since. Mr. Whetstone is a lieutenant in the Ames Fire Department. Bruce has done well with them, although one or the other of them has had to be up with him frequently at night because of his ear trouble. Whetstones accepted him on the understanding they would take care of him only temporarily, but of course they have grown close to him with passage of time. They would hate to see him go to an institution, and would be willing to adopt him rather than have that happen.

After Bruce was with Whetstones, Allan visited him sporadically, but the visits upset the child. Bruce cried when left alone with Allan, and this angered Allan. Bruce seems to have some basic fear of Allan and does not recognize him as father. Allan made some support payments, although not toward the end. The Department did not like to have the matter left in limbo, because of increased trauma on moving Bruce as time grew longer.

Meantime Mary moved back to her parents with Timothy and commenced a divorce suit in Dallas County, Iowa. That suit pended, and the future of Bruce was left undetermined while the parties to the divorce negotiated. Allan lived at various places and eventually became acquainted with Barbara Ball, a divorcee with two children. He moved in with her and lived in adultery.

Before the divorce suit came to trial, Allan thought it better to quit living with Barbara and moved out. He went to Waterloo, Iowa, got a night job in a bakery, and took two sleeping rooms in a house with kitchen and bathroom privileges, and a baby sitter available several blocks away.

On December 13, 1968, Mary and Allan reached a stipulation of settlement of the divorce suit. Basically they agreed Mary should have custody of Timothy and Allan should have custody of Bruce. On January 6, 1969, an uncontested divorce was granted to Mary and the stipulation was incorporated in the decree. Under the stipulation and decree, temporary custody of Bruce was left with the Department "until such time that the Defendant has established a reasonably proper home, approved by the Story County Welfare Department and a report submitted to this Court prior to transfer of said child and that the home shall, in addition, thereto be subject to periodic inspections by the Social Welfare Department to see that a proper home is maintained."

The stipulation of Mary and Allan, and the decree incorporating it, placed the Department in a perplexing position. On the basis of its knowledge of Allan and his family history, the Department believed him incapable of establishing a suitable home for Bruce. Yet Mary had stipulated, and accordingly the divorce court had decreed, that Allan should have Bruce. The Department therefore asked the Story County Attorney to lay the matter before the juvenile court in Ames, where the child was.

On January 15, 1969, nine days after the decree of divorce, the Story County Attorney filed the instant petition to terminate the parent-child relationship between Allan and Mary on the one hand and Bruce on the other. Mary agreed to the petition, but Allan contested. He first specially appeared on the ground the Dallas District Court already had charge of the matter. The special appearance was overruled. The juvenile court then heard the case on the merits, and the prior proceedings involving Allan as well as the present evidence were introduced. After reviewing the entire situation, the court concluded, "To place this small child into the custody of this father would be an invitation to disaster insofar as the child is concerned." The parent-child relationship was terminated. Hence this appeal.

■■ Two main questions confront us: (1) Ought the juvenile court have taken

jurisdiction in view of the prior divorce suit and decree? and (2) Ought the parent-child relationship between Allan and Bruce be terminated?

1. The first question involves the problem which arises when two courts in a state proceed with a controversy over which they both have some jurisdiction. Ordinarily the court first obtaining jurisdiction in a case is entitled to proceed with it to conclusion. In re Adoption of Ellis, 260 Iowa 508, 149 N.W.2d 804; 20 Am. Jur.2d Courts, sec. 128, p. 481; 21 C.J.S. Courts, § 492, p. 745.

Here the problem arises between a divorce court and a juvenile court. The divorce court obtained jurisdiction first and decreed custody, and its jurisdiction as to custody continued after decree. Code, 1966, sec. 598.14; In re Adoption of Ellis, 260 Iowa 508, 149 N.W.2d 804. Later the juvenile court took jurisdiction on a petition to terminate the parent-child relationship.

A number of jurisdictions have dealt with similar collisions between divorce courts and juvenile courts, and have reached diverse results largely on the basis of their statutes. Annotations, 11 A.L.R. 147, 78 A.L.R. 317, 146 A.L.R. 1153. We believe the Ames juvenile court properly assumed jurisdiction here, by virtue of our statutes and because of the overriding public interest in the welfare of children.

As to our statutes, when dependency, neglect, or delinquency of a child comes into question, or when termination of the parent-child relationship under the juvenile statute is the issue, a divorce court cannot act. This is because the legislature has given exclusive jurisdiction of those matters to the juvenile court. It is provided by section 232.63, I.C.A.:

"The juvenile court shall have exclusive original jurisdiction, only, in proceedings concerning any child alleged to be delinquent, neglected, or dependent, and in proceedings for termination of parental rights under sections 232.41 through 232.50, and in

proceedings concerning any minor alleged to have been delinquent prior to having become eighteen years of age except as otherwise provided by law."

In such instances, if something is going to be done judicially, the juvenile court must do it. Such was the situation which confronted the juvenile court when presented with the petition to terminate.

As to the public interest, Iowa divorce procedure to this time has left something to be desired so far as the welfare of children is concerned. See H.F. 1156, 63 G.A. (effective July 1, 1970). Many divorce suits are uncontested and as a practical matter the parties largely control such proceedings. They may stipulate regarding the custody of the children and obtain an uncontested decree, although if all the facts were known it might appear neither of them is a fit parent. Or one of them may default, leaving practical control of the suit in the hands of the other spouse— who may be unfit. As stated in State ex rel. Dubinsky v. Weinstein, 413 S.W.2d 178, 182 (Mo. App.):

"We are convinced that the general assembly in enacting the new juvenile act of 1957 and certain predecessor laws of a similar nature, recognized that other laws and procedures relating to the care and custody of children were not entirely sufficient and therefore intended that the juvenile court be given paramount jurisdiction over other courts in matters relating to the care and custody of children coming within the provisions of Chapter 211. The most obvious deficiency in the divorce court custody procedure is demonstrated by the case where one parent deserts the family and the other party is granted a divorce, often uncontested, and obtains custody of the children without more than a perfunctory determination of the fitness of said parent to rear them. Thereafter, if it develops that the children are neglected and being reared under or other improper conditions indicating the depravity of their custodian, there is no one (except the disinterested

defendant) who can file a motion for a change of custody."

'See also In re Adoption of Ellis, 260 Iowa 508, 514, 149 N.W.2d 804, 808 (subsequent proceedings to modify divorce decree must be in original divorce court "except perhaps in criminal or juvenile court cases"); State v. Worthington, 227 Ala. 204, 149 So. 709; McClendon v. Superior Court In and For County of Pima, 6 Ariz.App. 497, 433 P.2d 989; Smith v. Smith, 31 Cal.App.2d 272, 87 P.2d 863; Ladner v. Ladner, 206 So.2d 620 (Miss.).

We conclude the juvenile court properly assumed jurisdiction on the petition to terminate.

II. The other problem brings us to the merits. Several cases of this kind have been before the court. In re Morrison, 259 Iowa 301, 144 N.W.2d 97; In the Interest of Yardley, 260 Iowa 259, 149 N.W.2d 162; Harter v. State, 260 Iowa 605, 149 N.W.2d 827; In the Interest of Loeffelholz, 162 N.W.2d 415 (Iowa); Orcutt v. State, 173 N.W.2d 66, 67 (Iowa). A number of principles have been enunciated. The appeal is de novo; "It is well established in matters of this kind that the primary consideration is the welfare and best interest of the child"; "* * * children, like adults, cannot live on bread alone. Indeed, they need more than love. They need and must have proper guidance and must be furnished with a healthy mental and moral atmosphere by those who have their custody and control"; and "* * * a determination is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past." In re Morrison, 259 Iowa 301, 307, 311, 144 N.W.2d 97, 100, 103.

Bruce is now approaching three. He has sent down his roots in the Whetstone home and is doing well there. He has the ear trouble, but Whetstones are attending him for that. He is described as a happy and vivacious family member.

Allan has proved to be an inadequate parent. He is of limited intelligence; illiterate except for writing his name; of ungovernable temper; violent; of little education; without a strong sense of financial responsibility to the child; immature; uncomprehending of the basic responsibilities of parenthood; and insensitive to the needs and feelings of Bruce. Allan has gone from place to place and job to job. At the time of hearing, the home he had to offer consisted of a couple sleeping rooms with kitchen and bathroom privileges, and a sitter down the street.

If the past presages the future, a reasonable likelihood exists that Bruce, in Allan's hands, would be exposed to the kind of environment which wrought havoc with Tina and Danny. We reach the same conclusion on the merits as the judge of juvenile court when he said, "To place this small child into the custody of this father would be an invitation to disaster insofar as the child is concerned. This court will not risk this child to what this Court feels are certain dangers if the child is returned to his natural father."

Allan is an unfit parent by reason of conduct likely to be detrimental to the physical and mental health of Bruce. Sec. 232.41(2) (d), I.C.A. The parent-child relationship was rightly terminated.

Affirmed.

All Justices concur.