IN RE INTEREST OF DONALD YARDLEY, JR., et al., minors.

CELESTINE T. CROSS, petitioner-appellee, v. WANDA YARDLEY, appellant, DONALD YARDLEY, SR., appellee.

No. 52350.

(Reported in 149 N.W.2d 162)

MARCH 7, 1967.

Gene W. Glenn, of Ottumwa, for appellant.

Samuel O. Erhardt, of Ottumwa, for petitioner-appellee, and Herbert F. Box, of Ottumwa, for appellee.

GARFIELD, C. J.—This is a juvenile proceeding under chapter 232, Code, 1966 (chapter 215 Laws 61st G. A. 1965), asking that six children of Wanda Yardley be declared "neglected", within the meaning of Code section 232.2, subsection 15 (section

3 of the Act), and the parent-child relationship between the children and their parents terminated. Following a hearing the relief was granted as to all the children except the youngest and their mother, age 34, has appealed.

In view of the brevity of the printed record the shorthand reporter's transcript of the hearing consisting of 179 pages has been certified to us and carefully considered. (See rule 341, Rules of Civil Procedure.)

The action was instituted by filing a petition on January 4, 1966, by a child welfare worker for the Wapello County Department of Social Welfare in Ottumwa. Counsel for the mother appeared in resistance to the petition. Counsel for the father of the five oldest children, Wanda's divorced husband, also appeared and took part in the hearing (on January 31 and February 4) but consented that the relief sought be granted.

Wanda obtained the divorce from Donald Yardley, Sr., September 10, 1963, because he was living with another woman, his present wife. Wanda was granted custody of Donald, Jr., born June 21, 1951, Pamela, born May 31, 1954, and Sandra, born July 26, 1961. Donald, Sr., was awarded custody of Theresa, born January 6, 1956, and Joseph, born January 30, 1959. Wanda's youngest was not born until June 20, 1965.

Wanda never married again. Father of her youngest is a man from Milwaukee whom she met in a tavern in Ottumwa and knew only three weeks. He has furnished no support for the child and apparently does not know it exists. The home in which Wanda and four of her children lived is owned by her father who has a separate room of his own there.

Theresa and Joseph were unhappy at their father's, returned to their mother's in September 1964 and lived there much of the subsequent time. Donald, Sr., and his present wife have a young child of their own and his wife has three older children who live with them. Donald drives a moving van and is gone from home most of the time. Wanda's principal income consists of payments from Aid to Dependent Children (A. D. C.).

The case was referred to the child welfare branch of the Department of Social Welfare in April 1964 following com-

plaints the children were being neglected. Petitioner told Wanda it was claimed she was leaving the children alone while she went to taverns and that she was having a man in her home. This Wanda denied. The house was found to be cluttered and untidy, the kitchen had unwashed dishes piled up, beds were unmade and without sheets or proper bedding. In 18 to 25 visits to the home by the time of the hearing petitioner found it in much the same condition as at first. Other social welfare workers confirmed this.

In March 1965 petitioner received a complaint that Wanda had thrown a shoe at the child Theresa and ruptured a blood vessel in her eye. Wanda admitted this but insisted she intended no injury. In April (1965) Wanda was found to be 7½ months pregnant with the child born out of wedlock. She insisted on keeping the child who was born in Ottumwa, rather than consent to its adoption.

When about to be confined in childbirth Wanda obtained a 17-year-old girl, Helen Guard, to come to the home and care for the children. Helen had dropped out of school when halfway through the tenth grade. She stayed in the home about a month, cared for the children, prepared their meals and kept house. Helen became 18 on October 25 and Wanda's father consented that she come there then to make her home. She was still living there at the time of the hearing. Some of Wanda's troubles stem from Helen's presence in the home.

Helen admitted as a witness a divorced man named Buck stayed with her in the back bedroom all of about three or four nights. The children who usually slept in that bed were required to give it up on these occasions. Wanda was at home and, according to Helen, did not object to such conduct. Another man who was "stewed up" came to see Helen and spent the night in the home although she said they were not "together" on this occasion. There is evidence Helen also entertained him in the bedroom at least once. Both men were friends of Wanda with whom she frequently danced at taverns or so-called clubs.

Wanda testified she did not approve Helen's entertaining men in the home or consent to it and did not know Buck spent

the night there until she got up the next day. We infer from her testimony that her claimed lack of prior knowledge of his presence there is mainly based on the fact she did not see him and Helen together on the bed. Wanda also testified the man who was "stewed up" should have been ordered out of the house.

Helen testified she was not pregnant "for sure" but had not had a medical checkup.

Wanda's need of a baby-sitter was largely due to her frequenting taverns and clubs where liquor was sold and dancing permitted. She usually went to a tavern Friday or Saturday nights and sometimes one other evening during the week. She would leave home at 8:30 or 9 and return between 11:30 and one. Donald, Jr., testified his mother was usually in by one or 1:30. Her father would take her to a tavern or club many evenings and she would return home with someone she saw there or in a taxi. Wanda testified she formerly went to taverns more frequently and stayed later—until 2 a.m. When she bought her own drinks they were usually pop but if someone bought hard liquor for her she would drink it.

About every other Monday evening Wanda "baby-sat" with six children while their mother went bowling. Sometimes Wanda stayed all night with this friend. On the Friday and Saturday nights following birth of her baby on Sunday, Wanda went to a tavern and stayed, according to her, until 12 and one. There is evidence she was away from home all of Friday night. It was shown without objection that Helen Guard told the paternal grandparents of the five children on Saturday afternoon she was worried about Wanda—she was just off somewhere drinking.

Donald, Jr., 14 at trial time, smoked cigarettes regularly but testified he was trying to stop; his mother bought cigarettes for him and the man Wanda said should have been ordered out of the home gave Donald cigarettes once. Donald was in the seventh grade in school at the time of the hearing. He and two of the other children were in "special education" part of the time. The last of June 1965 Wanda told a social worker

Donald had been a great deal of trouble lately and, so far as she was concerned, he could stay with his father.

Wanda's father provided little, if any, guidance for the children. He approved her frequenting taverns if she enjoyed it and someone stayed with the children. He did not know Wanda was pregnant with the last baby until six weeks before birth.

There is a good deal of evidence the children had enough food to eat, adequate clothes to wear and were kept fairly clean. What the children lacked was proper parental direction, moral guidance and good example. There was evidently a complete lack of religious training either in or out of the home.

Petitioner testified the local welfare office received constant complaints concerning the home and Wanda was highly emotional and immature. The office asked permanent removal of the children from the home and termination of parental rights.

There is other evidence of course but enough has been summarized to indicate what the record contains.

The trial court found the children were "neglected" within the meaning of chapter 215, section 3, subsection 15, Laws, Sixty-first General Assembly (section 232.2, subsection 15, Code, 1966), in that the father had abandoned the two children placed in his custody, all the children were "without proper parental care because of the faults or habits of [their] parents * * * or other custodian" and were "living under conditions injurious to [their] mental * * * health or welfare."

When the petition was filed on January 4, 1966, the court found it appeared the welfare of the children required their temporary custody be immediately assumed by the juvenile court and ordered them delivered to the county board of social welfare pending further order (see chapter 215, section 8; Code, 1966, section 232.7). The record indicates this was done.

In the final decree, dated April 20, 1966, the order for temporary custody was terminated as to the baby (then ten months old) and he was ordered returned to Wanda subject to strict supervision by the county department of social welfare.

The cause was continued as to the baby to be reviewed in one year. As to the other five children the parent-child relationship was terminated and their custody transferred to the county social welfare department. (See chapter 215, section 34, subs. 3b; Code section 232.33, subs. 3b.)

█ I. As counsel for petitioner-appellee and for appellant (Wanda) concede, our review is de novo. Chapter 215, section 59; Code section 232.58; In re Morrison, 259 Iowa 301, 306, 144 N.W.2d 97, 100, and citations.

Especially when considering the credibility of witnesses we give weight to the fact findings of the trial court but are not bound by them (rule 344(f)(7), Rules of Civil Procedure). In re Morrison and State ex rel. Wiley v. Richards, 253 Iowa 679, 113 N.W.2d 285, elaborate upon this proposition. It would seem peculiarly applicable in a matter of this kind.

█ "* * * the rule is well established in custody matters that a determination is necessarily based on what is likely to occur in the future because of present conditions and because of what has occurred in the past [citation]." In re Morrison, supra, on page 307.

█ II. Appellant has assigned errors relied upon for reversal as in appeals in law cases. The first of these is in admitting hearsay evidence. The others are errors (2) in the court's findings of fact (3) in finding the children were "neglected" and (4) in ordering termination of the parental relationship of appellant. The second and third of these really challenge the sufficiency of the evidence to support the findings and the fourth is a similar challenge to the order referred to.

Ordinarily we do not review such errors as 2, 3 and 4 where our review is de novo. In such matters we review the facts as well as the law and draw what we think are proper conclusions therefrom. Gilbrech v. Kloberdanz, 252 Iowa 509, 515, 107 N.W.2d 574, 578; Arnold v. Arnold, 257 Iowa 429, 433, 133 N.W.2d 53, 56.

█ III. With reference to the first assigned error, the trial court overruled some objections of appellant's counsel as hearsay to questions asked petitioner regarding statements by

the daughter Pamela, then 11, about January 1, 1966, during an investigation following a call from Donald, Sr.'s then wife. According to the testimony the child told petitioner she did not wish to return to her mother's home, she and Helen Guard entertained men there and Helen was five months pregnant.

If it were not for section 47, chapter 215 (section 232.46, Code, 1966), infra, this testimony would be inadmissible as proof of the claimed facts contained in the girl's statement. Shepard v. Gerholdt, 244 Iowa 1343, 1349, 1350, 60 N.W.2d 547, 551, and citations; Annotation, 35 A. L. R.2d 629, 648; A. L. R.2d, Later Case Service, Volume 4, page 278.

We are not prepared to hold, however, the evidence would be inadmissible, regardless of section 47, as bearing on the state of Pamela's mind, her feeling toward her mother and Helen, and the effect of their conduct upon her. Castner v. Wright, 256 Iowa 638, 648, 649, 127 N.W.2d 583, 589; Kiger v. Meehan, 253 Iowa 746, 751, 113 N.W.2d 743, 746, 747; Glatstein v. Grund, 243 Iowa 541, 548, 51 N.W.2d 162, 167, 36 A. L. R.2d 531, and citations. See also Goodale v. Murray, 227 Iowa 843, 857–861, 289 N.W. 450, 126 A. L. R. 1121.

Section 47, chapter 215 (section 232.46, Code, 1966), provides: "The court's finding with respect to grounds for termination shall be based upon a preponderance of evidence under the rules applicable to the trial of civil cases, provided that relevant and material information of any nature including that contained in reports, studies, or examinations may be admitted and relied upon to the extent of its probative value. When information contained in a report, study, or examination is admitted in evidence, the person making such a report, study, or examination shall be subject to both direct and cross-examination when reasonably available."

Relevant and material information of any nature, including that contained in reports, studies or examinations, seems to include hearsay. It may, however, be relied upon only to the extent of its probative value and the person making the report, study or examination is subject to direct and cross-examination when reasonably available. See in this connection In re Halamuda, 85 Cal. App.2d 219, 192 P.2d 781, 783, 784;

In re Garcia, 201 Cal. App.2d 662, 20 Cal. Rptr. 313, 315; Appeal of Dattilo, 136 Conn. 488, 72 A.2d 50, 52–54; Jenkins v. Jenkins, 304 Mass. 248, 23 N.E.2d 405, 407, 408. See also Kent v. United States, 383 U. S. 541, 86 S. Ct. 1045, 1054, 16 L. Ed. 2d 84.

No question of constitutionality of section 47 is raised or suggested. The trial court's decision does not indicate it is based on any hearsay except perhaps, in part, the statement that Pamela did not wish to return to her mother's home. As previously indicated, we think evidence of this statement would be admissible under traditional rules for the limited purposes before mentioned. We are satisfied appellant's first assigned error does not call for a reversal.

IV. This mainly leaves the question whether the evidence, as we have reviewed it, is sufficient to support depriving this mother of five of her six children. With the modification referred to infra we think it does.

Section 42 of chapter 215 (Code section 232.41) provides: "The court may upon petition terminate the relationship between parent and child: * * *

"2. If the court finds that one or more of the following conditions exist: * * *

"b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection. * * *

"d. That the parents are unfit by reasons of debauchery * * * or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.

"e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

It will be noticed that "d" above grants broad power to the court that we think authorized termination of the parent-child relationship here.

In re Morrison, supra, 259 Iowa 301, 311, 144 N.W.2d 97, 103, seems to be our only decision under the Juvenile Court Law enacted in 1965 by the Sixty-first General Assembly. Although the grounds for terminating the parent-child relationship

there were somewhat stronger than here, the opinion contains much that is applicable:

"It is well established in matters of this kind that the primary consideration is the welfare and best interest of the child. [citation] While there is a presumption that the best interest of the child will be served by leaving it with its parents, this is not conclusive. · [citation] Obviously, there was substantial evidence presented here to overcome that presumption. We do not overlook the right of a child to.the care, support and affection of his parents, and of the parents' right to custody unless by their conduct they forfeit that right. Nevertheless, we must recognize that the State, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. Stubbs v. Hammond, 257 Iowa 1071, 135 N.W.2d 540; State ex rel. Wiley v. Richards, supra, 253 Iowa 679, 680, 113 N.W.2d 285, 286.

"We do not overlook the fact that these children were kept clean and well-fed, that their physical homelife was about average for persons of their parents' means, and that they attended church frequently. We credit the parents for that and, were it not for the obvious atmosphere of unwholesomeness generated by the words and deeds of these parties, we would perhaps be more hesitant to dissolve this parent-child relationship. * * * They need and must have proper guidance and must be furnished a healthy mental and moral atmosphere by those who have their custody and control."

What is said in Stubbs v. Hammond and State ex rel. Wiley v. Richards, cited in the quoted excerpt, is also to be commended. (Unlike In re Morrison, there was evidently no church attendance here.)

Incidentally, the Morrison opinion upholds the validity of the statute as against the charge parts of it are too vague and unconstitutional.

V. As before stated, the trial court's final decree dated April 20, 1966, ordered the baby returned to Wanda subject to strict supervision by the county department of social welfare and continued the cause as to him to be reviewed in one year. After referring to this provision appellant's brief and argument

suggests opportunity should have been given Wanda to correct whatever faults and deficiencies were found relative to her conduct with respect to all the children.

We think there is merit in this suggestion as applied to any of the five older children who have not been adopted by others under the provisions of Code chapter 600 at the time this opinion is filed.

Section 59 of chapter 215 (Code section 232.58) provides: "The pendency of an appeal * * * shall not suspend the order of the juvenile court regarding a minor and shall not discharge the minor from the custody of the * * * agency to whose care the minor has been committed or placed unless otherwise ordered by the supreme court on application of an appellant."

No application for an order under this provision was made to us pending the appeal. See in this connection Savery v. Eddy, 242 Iowa 822, 840–844, 45 N.W.2d 872, 47 N.W.2d 230, 48 N.W.2d 230.

While we feel sufficient grounds existed for the order of termination when made, it is possible conditions in the home or Wanda's conduct have improved to the point where some or all of the children may properly be returned to her. We are reluctant to approve taking the children from their mother permanently without giving her another opportunity to show she is now capable of caring for them in a manner not detrimental to their mental health or morals. Such a showing would accord with the declaration of section 2 of chapter 215 (Code section 232.1) that a child "shall receive, preferably in his home, the care, guidance, and control that will conduce to his welfare and the best interests of the state, * * *."

We modify the decree to provide for the taking of additional evidence in the trial court as to whether conditions in the home and Wanda's conduct at the time of hearing it are such that custody of the children should be returned to her and for such further orders with reference thereto as may be proper.—Modified, affirmed and remanded.

All JUSTICES concur.