In the Interest of Joyce McDONALD, Melissa McDonald, Children, Appellees.

The STATE of Iowa, Appellee,

v.

David McDONALD and Diane McDonald, Appellants.

No. 55162.

Supreme Court of Iowa.

Oct. 18, 1972.

Donald E. Doyle, Davenport, for appellants.

Richard Turner, Atty. Gen., Lorna L. Williams, Sp. Asst. Atty. Gen., Edward N. Wehr, Scott County Atty., Thomas G. Schebler, Asst. Scott County Atty., for appellees.

MASON, Justice.

This is an appeal from an order of the municipal court of the city of Davenport sitting as the juvenile court of Scott County terminating the relationship of parent and child existing between David McDonald, father and Diane McDonald, mother, and their twin daughters, Joyce and Melissa McDonald. The parents challenge sufficiency of the evidence to support the order.

A Scott County juvenile probation officer had filed a petition seeking termination of the relationship in which it was alleged the relationship should be terminated in that the parents are unfit by reasons of conduct found by the court likely to be detrimental to the physical or mental health or morals of children as defined in section 232.41(2)(d) and for the further reason that following an adjudication of dependency, March 3, 1969, reasonable efforts under the direction of the court had failed to correct the conditions leading to the termination. Section 232.41(2)(e).

Termination of the relationship between the parents and a child is controlled in this factual situation by sections 232.41 through 232.50, The Code.

Section 232.41 provides in part:

"When relationship changed. The court may upon petition terminate the relationship between parent and child:

"1. * * *

"2. If the court finds that one or more of the following conditions exist:

"a. * * *

"b. * * *

"c. * * *

"d. That the parents are unfit by reasons of debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be deterimental to the physical or mental health or morals of the child.

"e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

The court appointed an attorney to represent the parents at the hearing required by section 232.44. He has continued to represent them on their appeal to this court. Separate counsel was also appointed to represent the children at the hearing. He takes no part in this appeal. The hearing commenced June 24, 1970 was adjourned until July 22 and concluded on that day. Findings of fact were filed August 8 and decree August 10.

The court, after summarizing the evidence produced at the hearing, noted in its findings of fact that the evidence compelled a finding "that Diane McDonald, primarily because of her very low IQ, is simply not able to give to these twins the proper care and attention, including but not limited to the stimulation which the twins

need and to which they responded almost immediately when placed in the foster homes. Nor is there any reasonable probability that Diane McDonald would be able to substantially improve her past performance with the twins, should they continue for a further period even as long as a year, in foster care. The Court is reluctantly convinced that because of this mother's very low IQ she could never adequately take the proper care of these twins or at least provide them with the stimulation in her home that they must have to grow and develop into normal, healthy children. Unfortunately, although David McDonald is able to do considerably better, the best interests of the twins requires a termination as to him as well."

The court concluded, "2. That the relationship now existing between David McDonald, father, and Diane McDonald, mother, and Joyce McDonald and Melissa McDonald, children, should be terminated because the parents are unfit by reason of conduct found by the Court to be detrimental to the physical and mental health of said children, as defined in section 232.-41(2)(d) * * *.

"3. That the relationship now existing between David McDonald, father, and Diane McDonald, mother, and Joyce McDonald and Melissa McDonald, children should be terminated because following an adjudication of dependency on March 3, 1969, reasonable efforts under the direction of the Court have failed to correct the conditions leading to such findings, as provided in section 232.41(2)(e)."

I. Our review is de novo. Rule 334, Rules of Civil Procedure.

David McDonald, 20, and Diane Kroeger, 17, were married May 27, 1967. David testified that approximately two years before his marriage, a Davenport doctor had hospitalized him at the University Hospital in Iowa City for a nervous condition and general health. About nine months before his marriage he was again hospitalized, this time at Mercy Hospital in Davenport by his mother. After about two weeks David was transferred to Pine Knoll for observation and mental tests. During the time he was at Pine Knoll he was released during the daytime to work in Davenport. When discharged about two months before his marriage, David said he was "physically and mentally good."

During her pregnancy Diane had considerable physical problems caused by retention of fluid during this time. Her blood pressure elevated causing anemia; her blood count was so low she was hospitalized at the University of Iowa Hospital the last two months of her pregnancy. Joyce and Melissa were born at Iowa City February 7, 1968.

The twins were removed from the hospital by the parents against medical advice and returned to Davenport. They remained either in the McDonald home or the home of Mrs. Graves, paternal grandmother, until they were placed in separate foster homes November 8, 1968.

A visiting counselor with the Davenport public school system testified that David had been given the Wechsler Adult Intelligence Scale January 21, 1965 and recorded a full scale IQ of 74. David had quit school in the eleventh grade. Diane had been tested September 21, 1964 and her full scale score IQ was 47. We are not told about her background except that she came from "a very cruel and immoral home."

At the time of trial the McDonalds were the parents of another baby then three weeks old. Since then Diane has had surgery.

Elaine Hughes, a registered nurse with 25 years experience, presently serving as a nurse of Davenport Visiting Nurse Association, made one unannounced visit to McDonalds when the twins were four months old. When Miss Hughes arrived David and Diane were upstairs in another apartment. They came down to show her the children. The nurse testified the babies were in a clean bed with "propped bottles,"

which she felt was dangerous as the babies might choke and that "a mother should hold their baby to feed it." She observed their diapers were both quite soiled and dirty. "They were pale, just unresponsive as far as—no stimulation, lack of stimulation is probably the way I would say." She noted in her office records following this visit "diaper rash and a possibility of a slight cold."

On three or four occasions Miss Hughes made limited observation of the twins when they were brought to the Well-Baby Clinic. When asked what part she had to do with the children on these occasions she replied, "All I did was see the children." She had seen the children once in the foster homes in May 1970. This is a fair summary of her contacts with the children.

She expressed the opinion it would be very difficult for Diane and David to properly care for the children by reason of "their limited knowledge, the ability of Diane to care. * * * She wasn't able to follow instructions; and I think due to the fact of this, that she is unable to care for the children properly."

Mrs. Clanton, a deputy probation officer, told of the children being sent to Iowa City for evaluation tests when they were a year old. These tests disclosed the children were not retarded but needed love and affection and would probably regress if placed back in the original home.

The witness had never been in the McDonald home nor had any contact with the two children. She related an experience with another mother with a low IQ who was unable to deal with her child, didn't know when or what to feed him and didn't have the capacity to give the love and care to her child or realize that you can't walk off and leave an infant. It was Mrs. Clanton's opinion that a person with a low IQ did not have the capacity to love and show affection as a person of normal intelligence.

She was asked why her office was seeking termination of the relationship. We set out her answer as shown in the record.

"Because children this age should not remain in foster care indefinitely. These children are now two and a half years old. They should not remain in foster care for another two and a half years, for instance, and become of an age when adoption is more difficult. It would appear that it is only fair to the children, if the parents are not going to be in a position to have them back in their home, that there be a severance so they could have their own homes at this time. And the reason we filed the severance Petition was at the request of the Supervising agency."

Barbara Moore, a social worker employed by the Scott County Department of Social Services, first observed the McDonald twins October 7, 1968 during a visit to the Graves home. Miss Moore testified the children were listless, appeared to have colds and in general did not look very healthy.

Except for a visit November 4 at the Graves home while David and Diane were present Miss Moore did not have opportunity to observe the parents with the twins over any extended period of time. On this occasion Miss Moore, accompanied by one or possibly two social workers or nurses, discussed with Diane and David the possibility, advisability or reality of placing the children in foster homes because of their physical health. After the twins were placed in foster homes Miss Moore visited with McDonalds 30 to 35 times, some of these visits were in the McDonald apartment, others at Miss Moore's office. The witness said the purpose of these visits was to discuss visitation of the children in the foster homes by the parents and to make the parents aware of what was expected if the children would be returned. Suggestions were made to David about stabilizing his job situation and living conditions.

The witness expressed doubts about Mrs. McDonald's ability to cope with the situation where Diane had to mother children, care for them, give them guidance and all the things a mother would have to do. She based this opinion upon Diane's responses

when the witness attempted to talk with her. Mrs. McDonald never initiated any conversation, everything "had to be pulled out of her" and often times the witness didn't get too much response. Miss Moore expressed the opinion Mrs. McDonald had a general lack of concern about the twins during these visits. This was not true of David who was interested and concerned about his children.

The petitioner also offered testimony of the foster mothers of Joyce and Melissa relating to the physical appearance of the children when they were brought to their respective foster homes, their progress while there and some details of visitation by the parents.

Respondents called Joyce Graves as a witness. She testified she knew David wanted to marry Diane but she was opposed to the marriage and signed necessary papers to place David in Mercy Hospital. From her experience of raising 11 children—six ranging in age from 2 to 19 still at home—it is evident Mrs. Graves had an appreciation of the care demanded of a mother. She said she foresaw difficulties arising from the marriage because of Diane's mental slowness. Although she felt her son could provide a home for the twins, she was concerned about Diane's capabilities to be a mother. This was the basic reason for opposing the marriage.

According to Mrs. Graves' testimony the twins were first brought to her home two weeks after they were born. David and Diane and the twins remained at her home until about two weeks before May 8 when Mrs. Graves was hospitalized herself to deliver her baby. She had surgery, cancer and a heart condition. There was to be future surgery. The twins were returned to Mrs. Graves a second time either in late June or early July. Diane and David lived at a different location. So, with the exception of about two months, the twins were with her from birth until they were placed in foster homes.

Mrs. Graves took issue with petitioner's evidence as to the health of the children when they were placed in foster homes and with the result of visits by social workers. She described the diaper rash, the cause and her efforts to clear it up with medicine furnished by the visiting nurses. She had taken the twins to a Davenport doctor at David's suggestion. The physician advised her to change the babies' formulae and told her the children had a little bronchitis.

Mrs. Graves could not honestly say that at the time of the hearing Diane could do the things necessary for the children although there were certain things she could do with training. She had improved in her housekeeping considerably. Mrs. Graves taught Diane to bathe the children which she was afraid to do at first and to make a formula. However, it took some coaxing and a lot of patience to accomplish this. Mrs. Graves' expressed compassion for Diane because of her earlier home life, or lack thereof, and the indifference of her mother.

When asked on cross-examination if she agreed that Diane was not capable of caring for children she answered:

"As far as feeding them, I think Diane can feed them and nurse them. I don't know if she can make a decision on illness, or if she went into labor I don't know whether she would be able to know what to do on something like that, no, I don't know that."

David testified he was presently employed by a metal processing plant, evidently in Bettendorf, at an hourly wage of $2.56 with a strong probability his hourly rate would be raised to $3.00 in the near future. Ordinarily, he works from 7 a. m. until 5:30 p. m. but is required to work overtime when work conditions demand. During the two-month period before the hearing David had been working seven days a week. His take home pay varies from $82 to $100 per week. At the time of the hearing he was indebted to the extent of $235.

He doesn't own a car and gets from his home in Davenport to work any way he can —hitchhiking or riding the bus. He is required to leave home about 5:30 a. m. to get to work and arrives home about 6:15 in the evenings.

As a witness David repeatedly expressed a desire to have the twins returned to him and his wife. He testified he had had experience in bathing and feeding his mother's small children and declared a willingness to help with the children in the evenings after coming home from work.

He told of an arrangement made with a 25-year-old lady who lives across the hall from his apartment to help take care of the twins and the third child born to this marriage for the first few months in order to get the children on schedule and assist his wife and teach her how to care for the children in the event the children were returned to the McDonald home. This lady had two small children of her own, the older being approximately two and a half years. She and her husband were separated. Whether she is in the process of seeking dissolution is not clear from the record. He felt he could pay her $15 a week from his wages.

David said he had also made arrangements before the children were taken to the foster homes through General Housekeeping to send a lady in from 7 a. m. until he arrived home in the evenings to coach his wife and give her child care training but when the twins were placed in foster homes this did not materialize.

The record discloses that McDonalds are presently experiencing physical problems with the third child. She has leakage of the heart which will require surgery and her arm was broken at birth.

Diane did not testify on her doctor's advice.

Counsel for McDonalds point out that, "There is no evidence of their 'debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct—likely to be detrimental to the physical or mental health or morals of the children.'" This is true and serves to factually distinguish the present case from Re Interest of Morrison Children v. State, 259 Iowa 301, 144 N.W.2d 97; In re Interest of Yardley, 260 Iowa 259, 149 N.W.2d 162; and Harter v. State of Iowa, 260 Iowa 605, 149 N.W.2d 827. In the cited cases there was substantial evidence of infidelity, quarreling between parents, separations, illegitimate births and in one, attempts of suicide and in two, physical abuse inflicted upon the children involved.

It cannot be logically argued that there is substantial evidence in the record before us to support a finding of willingness on David's part to avoid responsibility of providing care and support for the twins, a fact that distinguishes this case from In Re Loeffelholz, 162 N.W.2d 415 (Iowa 1968).

However, as previously noted, it had been alleged as a ground for termination of the relationship between parent and child "that following an adjudication of . . . dependency, reasonable efforts under the direction of the [trial] court have failed to correct the conditions leading to the termination"; the court reached the conclusion that the relationship should be terminated "because following an adjudication of dependency on March 3, 1969, reasonable efforts under the direction of the court have failed to correct the conditions leading to such findings." Section 232.41(2)(e).

"A dependent child includes one 'who is in need of special care and treatment required by his physical or mental condition which the parents, guardian, or other custodian is unable to provide.' (Code section 232.2, subd. 14, par. b.)" In re Augustus, 158 N.W.2d 625, 630 (Iowa 1968).

In our de novo review we have considered not only the printed record but also the shorthand reporter's transcript of the hearing consisting of 217 pages. See rule 341, R.C.P.

There is substantial evidence that neither conditions leading to the twins being placed in foster homes November 8, 1968 nor those conditions leading to the court's finding of dependency following the March 3, 1969 hearing have been corrected by reasonable efforts under the court's direction.

Both procedures were made necessary by reason of Diane's inability to properly care for the children.

Although there has been considerable improvement in Diane's ability to keep house, there still remained at the time of the termination hearing held more than two years after the birth of the twins a serious doubt as to Diane's ability to cope with the situation requiring guidance and to perform those things a mother must do in raising children.

As noted in the quoted portion of its findings, the juvenile court was "reluctantly convinced that because of this mother's very low I.Q. she could never adequately take the proper care of these twins or at least provide them with the stimulation in her home that they must have to grow and develop into normal healthy children." There is substantial evidence to support this finding. Mrs. Graves, Miss Moore and Miss Hughes all expressed doubt as to Diane's ability to perform the functions of a mother because of her very low IQ.

Since there is no reasonable probability Diane would be able to substantially improve her past performance in caring for the children, the longer they remain in foster homes the more difficult adoption will become.

By the time this opinion is filed the twins will be four and half years old. They should have proper guidance and a healthy mental atmosphere from those who have their custody. In re Augustus, 158 N.W.2d at 629, and authorities cited.

When the twins were seen in May before the hearing they appeared to be normal children in all respects, mentally and physically.

II. This court has repeatedly stated that in matters of this kind the primary consideration is the welfare and best interests of the child. While there is a presumption that the best interests of the child will be served by leaving it with its parents, this is not conclusive. The State, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. Re Interest of Morrison Children v. State, 259 Iowa at 311, 144 N.W.2d at 103 and In re Interest of Yardley, 260 Iowa at 268, 149 N.W.2d at 167–168.

In equity matters, such as this, where our review is de novo it is our responsibility to review the facts as well as the law and adjudicate rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the course of the trial court's proceedings. Rouse v. Rouse, 174 N.W.2d 660, 666 (Iowa 1970). Therefore, we conclude, as did the juvenile court, that the best interests of the twins require termination of the relationship existing between David McDonald, father, and Diane McDonald, mother, and Joyce and Melissa McDonald, children.

The case is therefore

Affirmed.

All Justices concur, except LeGRAND, J., who takes no part.