In the Interest of Roxanne WARDLE, a child.

In the Interest of Shawn WARDLE, a child.

No. 55844.

Supreme Court of Iowa.

May 23, 1973.

Joseph P. Zwack, Law Offices of C. J. May, Jr., Dubuque, for appellant.

Richard C. Turner, Atty. Gen., Lorna L. Williams, Sp. Asst. Atty. Gen., Thomas R. Hronek, Asst. Atty. Gen., John J. Goen, County Atty., for appellee.

MASON, Justice.

Janice Wardle, mother of Roxanne and Shawn Wardle, appeals from the decrees terminating in separately instituted actions the parent and child relationship between her and these children.

Although she has never married, Miss Wardle, 26, is the natural mother of three children. Roxanne was born November 29, 1967 and lived with her mother until the present action was instituted at which time she was placed in the foster home of Mr. and Mrs. O'Brien. Shawn, who was born December 29, 1969, had been placed in the O'Brien home at the age of eight 'months preceding an adjudication of neglect grounded on a finding he was undernourished. Both children presently live with the O'Briens. Miss Wardle's third child, Julie, has been adopted.

April 7, 1972, the Dubuque county attorney filed a petition seeking severance of the relationship between Roxanne and Janice Wardle, wherein he alleged Miss Wardle had "substantially and continuously or repeatedly refused to give the child necessary parental care and protection." The same day a separate action concerning Shawn was initiated on the same basis and for the further reason that following an adjudication of neglect separating the infant from his mother August 2, 1971, "reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

These actions to terminate the parent-child relationship were instituted pursuant to section 232.41, The Code, which provides in part as follows:

"When relationship changed. The court may upon petition terminate the relationship between parent and child:

"1. * * *

"2. If the court finds that one or more of the following conditions exist:

"a. * * *

"b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

"c. * * *

"d. * * *

"e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination."

The cases were jointly heard by the Dubuque district court sitting as the juvenile court of Dubuque county April 21 and the court's decree was filed that day terminating the parental relationship between Miss Wardle and both children. After a motion for new trial was sustained separate counsel was appointed to represent the children before both cases were again tried to the court. The proceedings concluded on July 14, separate findings of fact and conclusions of law and judgments were filed July 17 and the parent-child relationship existing between the parties was terminated.

I. This court has repeatedly stated that in matters of this kind the primary consideration is the welfare and best interests of the child. While there is a presumption that the best interests of the child will be served by leaving it with its parents, this is not conclusive. The State, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. Re Interest of Morrison Children v. State, 259 Iowa 301, 311, 144 N.W.2d 97, 103; In re Interest of Yardley, 260 Iowa 259, 268, 149 N.W.2d

162, 167–168; In Re McDonald, 201 N.W. 2d 447, 453 (Iowa 1972).

In *McDonald* this court said: "In equity matters, such as this, where our review is de novo it is our responsibility to review the facts as well as the law and adjudicate rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the course of the trial court's proceedings." Id.

The court noted in its findings of fact relating to Roxanne that:

" * * *

"3. The child's mother is mentally handicapped and unable to assume the responsibility of providing the child with the psychological supports, care and guidance that a child of tender age requires.

"4. Repeated and constant and intensive efforts by the Dubuque County Department of Social Services to assist and support the mother in the carrying out of her parental duties have been unsuccessful and there appears now to be little likelihood of such result ever being achieved."

The court concluded the parental relationship between the mother and the child should be severed.

In regard to Shawn the court found that since he was adjudged neglected and placed in a foster home, "repeated and constant case work with the mother of the child has not been successful in correcting the condition that created the neglect of the child, and it now appears unlikely that any such correction can be achieved in view of the fact that the mother's lack of controls and inability to provide the spiritual support essential to child rearing, both grew out of the retardation with which the mother is afflicted and for which there is little likelihood of correction."

The court concluded "eventual severance will be the only probable solution," and therefore terminated the parental relationship.

In seeking reversal Miss Wardle relies upon one proposition—error in the court's finding she was incapable of caring for the needs of her children so as to require severance of her parental rights. In support she argues in two brief points the law presumes the best interests of a child will be served by leaving it with its parents and the child's welfare is the primary concern of the court in such matters.

■ Of course, in view of the statements of law set forth earlier in this division we have no disagreement with the contentions urged in these brief points. Our problem under the extent of review applicable in this matter is to determine anew whether the parental relationship between Miss Wardle and her two children should be terminated. We therefore turn to the record.

II. Connie Sarchet, a social worker with the Dubuque County Department of Social Services, testified she observed the behavior, environment and home life of Miss Wardle and her children over a period of about four years, affording Miss Wardle advice on matters affecting her welfare, as well as the children's. During this period she had contact with Miss Wardle by phone or in person at least weekly.

Although she disapproved of frequent moves from one apartment to another because it added to the instability and put Miss Wardle further behind financially, Miss Sarchet stated Miss Wardle's home was very adequate, clean and there was no problem with the physical setting. The children and their clothes were always clean. However, while never in the home at mealtime, she believed the children's diet was deficient, citing two instances when she witnessed Roxanne eating cold TV dinners or fish sticks. She also considered the discipline administered to the children by their mother to be inadequate and inconsistent.

Essentially, termination of the instant parental relationship was warranted, in the opinion of Miss Sarchet, in view of Miss Wardle's inability to satisfy the *emotional needs* of Roxanne and Shawn due to "her lack of intellectual capacity."

On cross-examination Miss Sarchet expressed the opinion that if the children were allowed to go back to Miss Wardle it would at least provide a permanency which they do not have in the foster home, but that is all it would provide. She did not believe Miss Wardle could handle the two children on a permanent basis.

July 21 and again on August 24, 1970 Miss Sarchet made a report to the juvenile court concerning Shawn Wardle. At the time of the first report her main complaint was that Shawn was severely undernourished and needed medical attention. After this report Miss Wardle took Shawn to Doctor Merritt (who was not produced as a witness) and the baby was immediately hospitalized from July 24 to August 4. Several tests were run on Shawn to determine if there was an organic reason for his condition. However, the results were all negative. Shawn was a small baby at birth (five pounds). When admitted to the hospital he weighed 8 pounds, 6 ounces, when released he was up to nine pounds, 12 ounces.

After Shawn was returned home, Homemaker service was set up in the Wardle home daily from 10 to 12 and 3 to 5 and was continuing at the time of the August 24, 1970 report.

In this report Miss Sarchet stated, "If the social welfare department could give continuous Homemaker service for years, Shawn could possibly receive the nourishment and stimulation he needs to survive. This is not realistic since it would have to be a 24 hour type of service." Since she believed Shawn would survive physically better in a foster home, she felt such placement was indicated and requested emergency custody of Shawn. As near as

we can tell Shawn was then placed in the O'Brien foster home.

Approximately a year later, August 2, 1971, Shawn was adjudged a neglected child.

A "neglected child" includes one who is without proper parental care because of the emotional, mental or physical disability, or state of immaturity of his parents or because of the faults or habits of his parents or one who is living under conditions injurious to his mental or physical health or welfare. Section 232.2, subd. 15, par. b, c, & d, The Code.

The following is from one of Miss Sarchet's reports:

"She [Miss Wardle] has repeatedly told me that our agency did the only thing we could by removing Shawn from her home and that he could have died if we had left him with her because she was too lazy to feed him. Miss Wardle has also said repeatedly that Shawn should stay in foster care until he is four or five years of age."

Thus far this division has been devoted to what is deemed to be a fair narration of evidence regarding Shawn as presented by Miss Sarchet's testimony at the hearing and by her written reports to the juvenile court. See section 232.46, The Code. Orcutt v. State, 173 N.W.2d 66, 72–75 (Iowa 1969); In Re Delaney, 185 N.W.2d 726, 730–733 (Iowa 1971).

Miss Sarchet's testimony at the hearing and her written reports to the juvenile court also covered her observations and experiences regarding Roxanne and the child's relationship with her mother.

We are told Roxanne had been with her mother since birth until Miss Wardle voluntarily placed her in the O'Brien foster home for about two or three weeks in late March or early April 1972. She visited the child once during that period and had Roxanne with her five or six days before the April hearing. After that hearing

Roxanne was again placed in the O'Brien home where she remained until time of trial.

Before being placed in the O'Brien home Roxanne had been sent to a nursery school with the case worker's approval. Miss Sarchet felt this had helped Roxanne because she received a lot of her needs which were not being met at home. It was her belief in regard to Roxanne's emotional situation that she has problems as far as being controlled and that the child's behavior improved while in the O'Brien home so she could be more easily controlled by the foster parents. There was also a general improvement in her speech.

Miss Sarchet expressed the view Roxanne could continue to live with her mother and physically survive. However, due to the fact Miss Wardle was overwhelmed by the care Roxanne needed and her inability to meet the child's affectional needs, Roxanne would become even more of a behavior problem. She did not think Miss Wardle could be helped with her care of Roxanne even if she were to receive some type of further counseling. Although Roxanne seemed bright, if she were to remain with her mother the possibility of her functioning to her full potential is very doubtful, not to mention the emotional trauma she would undergo.

She expressed her conclusion in this manner:

"I believe that Janice is aware that she is not being a parent to Roxanne and is so confused and bewildered by her role that she becomes easily depressed. Being placed in the role that she cannot fulfill is very frustrating to her but her lack of intellect prohibits her from even realizing her responsibilities much less meeting them.

"* * *

"In addition to Miss Wardle's apparent lack of intellectual ability, it is also very apparent that she has some gross emotional problems.

"* * *

"I waited four years before attempting to take the child [Roxanne] out of the home because I think we tried to give the child and parents every chance possible to see if there would be improvement. * * * I have not noticed much change in Miss Wardle in the four years I've worked with her. Perhaps it should have been done sooner."

Margaret McGrath, who worked with the family services unit of Dubuque County Department of Social Services, testified she had an opportunity to observe the relationship between Roxanne and her mother on several occasions when she drove Roxanne home from her nursery school. She was Miss Wardle's case worker, performing a different function from Miss Sarchet. Primarily she was involved in family counseling which consists of talking with Miss Wardle about her children, about the foster care unit, food, rent and transportation. She also drove the child from nursery school and tried to help Miss Wardle resolve some of her problems in the community.

Miss McGrath saw Roxanne almost daily from October until April 24 and it was her opinion the child was uncontrollable. Roxanne would throw things around on the floor and when her mother told her not to do certain things she would continue. She felt Miss Wardle seemed to be unable "to be taught to be a good parent, transfer discipline, transfer the common things that kids learn from their mothers as far as control in the community and the like."

Miss McGrath tried on occasions to explain the problem to Miss Wardle but she would either not understand or forget what she had been told by the next time Miss McGrath saw her. This witness was of the opinion the mother had not shown a willingness or capability of understanding.

She believed Miss Wardle's apparent lack of willingness or ability to discipline Roxanne justified severance of the parent-child relationship.

Dr. James Barta, a clinical psychologist at the Dubuque Mental Health Center, testified Miss Wardle had been given the Wechsler Adult Intelligence Scale a few days prior to September 29, 1970 and her full scale score IQ was 60. This test was supplemented with the Rorschach test, described as a commonly used projective test. He expressed the opinion that "Miss Wardle suffers from some psychological difficulties and deficiencies which would make it extremely difficult, if at all possible, for her to perform duties of motherhood according to the needs of her children."

We quote a portion of this witness' testimony:

"Two and one half out of one hundred people have a score of seventy or less. From part to part in the tests, we found the results quite consistent, which usually is a fairly good sign, except regarding those items which reflect a person's ability to abstract. This ability is needed in the process of making comparisons; to say that something is more than another, better than another, and it would be necessary in the processes of judgment and evaluations, an important human intellectual function. This particular part of her test was very weak, and so in that particular area of intellectual functioning, she is operating at less than the level of sixty. The projective tests indicated a lack of ability to be perceptive in the sense of being able to size up her world and know exactly what's going on, to evaluate her world with reasonable accuracy, consistency, it also showed a lack of impulse and emotional control in the sense that under stresses and pressures one should not be surprised to find the control very weak and unpredictable and very much lacking. * * *

"In my opinion it would cause difficulties and the difficulties would come whenever someone has to make a judgment of some sort, such as planning, trying to figure out the logical consequences of certain acts or procedures, making judgments. A lack of impulse, control or lack of control in pressure situations would, to my mind, be a great disadvantage for any parent or adult, and this, in my opinion, is one of the major weaknesses pointed out by the tests. By general approach to any human being is to assume that while there is life, there is changeable malleable possibilities of improving. But, the time and probability elements enter in, and I would think in this case substantial improvement could be realized only with very careful supervision over quite a long period of time. I would not expect that the estimates of intellectual functioning would ever substantially increase. It would be very limited. Improvement in impulse control might be moderate over a period of months and years. I just examined Janice once. * * *

"It is my opinion that Miss Wardle suffers from some psychological difficulties and deficiencies which would make it extremely difficult, it at all possible, for her to perform the duties of motherhood according to the needs of her children, and I would be forced by the evidence before me to recommend as I stated."

Dr. Barta did believe, however, that extensive supportive help over a sustained period of time could prepare Miss Wardle to properly care for Roxanne and Shawn. Absent such assistance he prescribed the prompt termination of the parent-child relationship.

Testimony of the children's foster mother, Mrs. O'Brien, concerning the emotional attitudes of Roxanne, the physical appearance of both children when they were initially brought to the foster home, and the emotional progress of Roxanne and physical progress of Shawn while there was also offered.

Other witnesses include Miss Wardle, her mother and Connie McIntyre, her sister. Miss Wardle testified that she successfully completed the ninth grade in

school; that Roxanne and Shawn were well fed and clothed while in her custody, and had received necessary medical attention; that she neither drinks intoxicating liquor nor smokes; that she has no criminal record; that she often cared for the children of relatives; that she overtly expressed her affection for the children; that she loved both Shawn and Roxanne and would have them returned to her home. However, it was her explicit desire that, if the court held not to terminate her parental rights, both Roxanne and Shawn remain with either Mrs. O'Brien or her mother for a period of one to two years while she received treatments at a state mental health center.

Since the April hearing Miss Wardle has been living with her mother, father and a younger sister in the parents' home in Dubuque.

Mrs. Wardle testified that, "With the welfare help, I could take care of Janice and the children if they came into my home. We'd need a little help from welfare. Presently Janice has been paying me support money because I couldn't do it without a little help from her. After they are twenty-one I figure they should be able to be on their own and not expecting their father or mother to take care of them. She's getting her welfare checks and will get them until they find out what they are going to do with the children. With a little financial help, I could raise these two children."

At another point in her testimony Mrs. Wardle said, "If Janice loses her welfare check, I cannot take care of Janice in the home. In that case, Janice would have to seek some other means. She's twenty-six years old and could stay for a while. I would not be willing to have Janice come in and live in my home permanently and raise the two children, I think she should be in a home of her own. It is her family, and she should see that they are taken care of properly, which she has up until this time."

The record discloses Miss Wardle owned her own household furnishings, including cooking utensils, dishes, bedding, a clock, radio and a television set. She did her own cooking, baking and laundry when she had custody of the children. In the eighth grade Miss Wardle got a C plus in spelling and a C minus in science. The only course she failed in completing nine grades was physical education. She is able to read, write and has no trouble hearing. She testified at length in her own behalf.

Miss Wardle had been in an institution sometime in her earlier life. However, we are not told in the record when this occurred or under what circumstances or the duration thereof. She tells us she plans to voluntarily seek admission to a mental health institution after the hearing, not because she feels a need for the type of treatment afforded in such institutions but rather to prove to the social workers involved there was nothing mentally wrong with her.

This evidence is too vague to be of help in the solution of the problem as is the quoted portion of the grandmother's testimony relative to her assisting her daughter in raising Roxanne and Shawn.

III. Since this appeal presents differing factual circumstances surrounding the two children, it is deemed advisable to consider each case separately.

■ Shawn had lived with his mother about eight months out of his first 23 months of life. The boy had been in the O'Brien home since Miss Sarchet's request for emergency custody in August 1970.

In August 1970 a petition was filed to adjudge Shawn a neglected child. Hearing on the petition was continued in September pending tests of the mother in the Mental Health Clinic in Dubuque by Doctor Barta. Shawn was adjudged a neglected child August 2, 1971.

As noted, one of the grounds alleged as a basis for termination of the parent-child

relationship between the boy and his mother was that reasonable efforts under the direction of the court had failed to correct the conditions leading to the termination. See section 232.41, subparagraph 2(e).

In our de novo review we find substantial evidence in the record to support this alleged ground for termination.

In this connection we review the circumstances existing at the time Shawn was originally placed in the O'Brien foster home. When Shawn was seven months he weighed 8 pounds, 6 ounces, a gain of 3 pounds, 6 ounces since birth. Yet, we are told there was nothing organically wrong with him. He was undernourished to the point where hospitalization was deemed necessary. It is fair to say his condition was brought about by his mother's inability to take care of his needs. Doctor Barta concluded as a result of his December examination that "Miss Wardle suffers from some psychological difficulties and deficiencies which would make it extremely difficult, if at all possible, for her to perform duties of motherhood according to the needs of her children."

Miss Wardle admitted it was easier to take care of Roxanne than Shawn. She said he cried a lot and this bothered her.

It is claimed and undenied that Miss Wardle expressed the desire that Shawn should stay in a foster home until he was four or five years of age; that she had repeatedly admitted to the social worker the agency did the only thing that it could by removing Shawn from her home since he would have died if left with her because she was too lazy to feed him.

There is substantial evidence that conditions leading to the court's placement of Shawn in the foster home and its subsequent adjudication of him as a neglected child have not been corrected despite reasonable efforts under direction of the juvenile court; that there is no reasonable probability such conditions are likely to change.

There is evidence by Doctor Barta and Miss Sarchet to the effect that the possibilities of Miss Wardle performing the duties of motherhood according to the needs of a two-year-old and a five-year-old child are minimal without certain structured services. In the case of Shawn the problem is primarily Miss Wardle's capacity to meet his physical needs. We are told Shawn could possibly receive the nourishment and stimulation he needs to survive if returned to his mother provided continuous 24 hour Homemaker service were furnished. But, Homemaker service is intended to help the parent take over responsibility of the child and not do it for the parent. When Shawn was returned from the hospital to Miss Wardle in 1970 there was evidence Miss Wardle did not take over her responsibilities in meeting Shawn's physical needs.

Counsel for Miss Wardle contends the state's action to terminate the parent-child relationship is in fact predicated solely on Miss Wardle's inability to score a high enough estimate number upon an IQ test. He maintains the Iowa Department of Social Services has, within the past few months, embarked upon a new standard for determining child custody which is based in very large degree upon the results of a particular IQ test.

In response to this contention we emphasize that our determination in these matters is based upon what we believe to be the best interests and welfare of the children involved. In the case before us, particularly the one involving Shawn, there is substantial evidence to support the state's allegation that reasonable efforts under the direction of the court had failed to correct conditions leading to the adjudication of his boy as a neglected child.

██ There is also substantial support for a finding there is no reasonable probability the conditions leading to the placement of Shawn in the O'Brien foster home will be corrected in the future in view of the evidence bearing on Miss Wardle's lack

of capacity to substantially improve in meeting the physical needs of Shawn if he were returned home. It is this lack of capacity on the part of the parent to meet the present physical needs of the child as well as her lack of capacity to substantially improve her performance in caring for his future needs which is to be primarily relied on in reaching a conclusion of what is for the best interests and welfare of the child. However, any mental disability of a parent is a proper factor to be considered in determining whether a child is neglected to the point where his best interests and welfare require a termination of the parent-child relationship. Section 232.2, subparagraph 15(b).

■ Mental disability of such degree as appears in this case is not a sufficient reason standing alone for termination of the parent-child relationship. Ordinarily, mental disability in a parent does not operate in a vacuum so far as the best interest and welfare of his child is concerned but is usually a contributing factor in a person's inability to perform the duties of parenthood according to the needs of his child. Such is the case here.

Under the record before us we conclude the best interests and welfare of Shawn require that the relationship existing between that child and Miss Wardle be terminated.

IV. The circumstances leading to the court's decree terminating the parent-child relationship existing between Roxanne and Miss Wardle are entirely different.

In Shawn's case it was contended Miss Wardle was unable to meet his physical needs. At six months he had the appearance of a two-month old infant, undernourished and badly in need of medical attention. This inability led to Shawn being adjudged a neglected child and his removal from the mother's home at eight months of age.

Roxanne, on the other hand, had been with her mother since birth until voluntarily placed in the O'Brien foster home in late March or early April 1972 when she was approximately four and a half years of age. Before the present termination proceedings were initiated she had not been declared a neglected child. It appears her general physical needs were being met; it was Miss Wardle's inability to meet Roxanne's emotional needs which was emphasized as one reason for seeking termination.

The girl was described as a healthy, well nourished, cleanly dressed, active youngster with a behavior problem. According to the social workers, this problem stems from Miss Wardle's failure to properly discipline the child. They cite as an example the child's activity on returning home from nursery school when she would throw her coat, turn on the television set and ignore the presence of adults in the room. When Shawn was at Miss Wardle's home both before and after his hospitalization witnesses described Roxanne's treatment of him as "rough," she pushed and pinched him. There is also evidence such behavior continued for a short time after both children were in Mrs. O'Brien's home.

There is the assertion Roxanne did not mind her mother; for instance, when she was told to stop doing certain things she would nevertheless continue.

When Roxanne was first placed in the foster home Mrs. O'Brien felt it was necessary to follow around behind the child to keep her out of mischief. It appears Roxanne was curious as to what Mrs. O'Brien had in her cupboards and undertook to find out. On another occasion she flushed a few tools down the toilet. This activity was soon controlled.

One witness who had observed the relationship between Roxanne and her mother felt the two did not react to each other; that there was no affection demonstrated, at least in her presence, of one toward the other. Roxanne was described generally as being a self-reliant youngster for her age. She dressed herself and on occasions fed

herself by going to the refrigerator and taking a cold fish stick or TV dinner to lunch on.

There is also testimony relative to the behavior problem to the effect that Miss Wardle did not spank Roxanne at the right times. There were times when the witness felt the child should have been spanked and was not; there were other times when she should not have been spanked and was.

One witness told of being left standing on the Wardle doorstep for an hour while Miss Wardle attempted to coax Roxanne into getting dressed.

There can be no doubt that every child needs discipline. However, there is no contention that Roxanne is incorrigible. After a few days at the nursery school Roxanne was able to play and get along with other children in the group. There is also the fact her behavior problem and ability to control her activities improved while in the O'Brien foster home. In other words, it seems obvious Roxanne's behavior problem can be corrected. But, in the eyes of the social workers Miss Wardle has thus far failed in this function.

The question is whether Miss Wardle is so deficient that there is no reasonable probability she will be able to substantially improve her performance in disciplining Roxanne.

Before reaching a conclusion the problem of whether Roxanne, described as a bright child, would function to her full potential if she were to remain with her mother remains to be considered. Since being in the foster home Roxanne's speech has improved. The teacher at the nursery school felt her vocabulary was inadequate for a child of her age and that unless improved, the child would experience difficulty in school.

■ It is true a good education would ordinarily be beneficial for this child's best interests and welfare and she should be afforded an opportunity to acquire one. The same school system will be available whether Roxanne is with her mother or a more affluent adoptive parent. There is a probability Roxanne would be placed in a home having certain advantages which she may never experience if left with Miss Wardle, including the possibility of a better social background with economic security. But, these advantages, regardless of how desirable, cannot serve as a basis for terminating a parent-child relationship even when coupled with Roxanne's behavior problem.

■ It is difficult to explain how the same person could be such an inadequate mother in meeting the physical needs of one child to the point where termination of the relationship was necessary and yet have the ability to properly perform the duties of motherhood according to the needs of another child. Nevertheless, we hold the record justifies the conclusion that Miss Wardle, when faced with the responsibility of performing the duties of motherhood according to the needs of Roxanne alone without the added responsibility of meeting the needs of Shawn, will be able to improve her past performance in disciplining Roxanne.

There is a vast difference between the facts in the case now before us and those presented to this court in In Re McDonald, 201 N.W.2d 447.

We hold the best interests and welfare of Roxanne would be best served by permitting her to remain with her mother. The matter is therefore remanded to the juvenile court with directions to set aside its order terminating the parent-child relationship between Roxanne Wardle and Janice Wardle and to order return of the child to her mother.

This decision is without prejudice to the right to institute proceedings under section 232.33, The Code, for the purpose of having determined whether Roxanne should be adjudged a neglected or dependent child by reason of facts or circum-

stances occurring after the July 14, 1972 hearing which led to the termination of the relationship between Roxanne and Miss Wardle.

As stated, the case involving Shawn is affirmed. This will mean that he is to be separated from his half-sister.

 In that regard this court has frequently said a brother and sister should not be separated and lose the benefit of constant association with one another except where the circumstances require it. McKay v. McKay, 253 Iowa 1047, 1053, 115 N.W.2d 151, 154; Welch v. Welch, 256 Iowa 1020, 1025, 129 N.W.2d 642, 644; Wells v. Wells, 168 N.W.2d 54, 60 (Iowa 1969).

However, the record discloses these children had not been raised as an ordinary brother and sister. Shawn had not been in Miss Wardle's home since August 1970 when, at the age of eight months, he was placed in a foster home. Roxanne was removed from the Wardle home in late March or early April 1972.

The record discloses sufficient circumstances which in our opinion require separation of these children.

The case is therefore Affirmed in part; reversed in part and remanded with directions.

All Justices concur except HARRIS, REYNOLDSON and McCORMICK, JJ., who dissent.

HARRIS, Justice (dissenting).

A consideration of all matters outlined in the majority opinion convinces me the trial court was right in terminating the parent-child relationship as to both children. I dissent from the part of the opinion which restores Roxanne to her mother.

In no way do I disagree with the majority's detailed description of the facts. I subscribe entirely to their recitation of the governing rules of law. Much as I sympathize with the tragic mother, I am, however, forced to conclude Roxanne needs and deserves to be rescued entirely from what seems to me to be a plainly intolerable family relationship.

The majority rightly points out this mother's mental disability, standing alone, would not be a sufficient reason for termination of the relationship. On the other hand the same disabilities should not serve to continue the relationship. Her deficiencies should not work to justify or excuse her obvious unfitness to provide Roxanne with any real chance for a reasonably adequate home life. I am not deterred in this view by the argument Roxanne so far has escaped some of the deprivations and cruelties heretofore directed by her mother to Shawn. I accept, as apparently does the majority, the testimony of Connie Sarchet, the social worker assigned to the case:

"She (the mother) has repeatedly told me that our agency did the only thing we could by removing Shawn from her home and that he could have died if we had left him with her because she was too lazy to feed him. * * *."

Such an admission characterizes Miss Wardle's unfitness as a mother. It is little comfort to Roxanne that the admission was made only as to her brother. It still graphically describes what sort of mother she is. Miss Wardle may have betrayed an awareness of her own unfitness when she told the social worker she would like the children to remain in foster care at least a year or two. Even more revealing is the mother's direct testimony that if the children are awarded to her she is going to have herself admitted to the Mental Health Institute.

With all deference to the majority for its desire to do justice to this pathetic mother, I believe the trial court was right. In all this unpleasant record I see no trace of advantage to Roxanne in continuing her relationship with her mother. I see no reasonable hope her mother's endowments

or fitness for motherhood can improve. The social workers toiled four years in an obviously futile attempt for such an improvement. Tragically it could not occur nor is it going to occur. Roxanne cannot wait to grow up. Termination of the relationship is long past due. The case should be affirmed.

REYNOLDSON and McCORMICK, JJ., join in this dissent.